SYLLABUS

(This syllabus is not part of the opinion of the Court. It has been prepared by the Office of the Clerk for the convenience of the reader. It has been neither reviewed nor approved by the Supreme Court. Please note that, in the interest of brevity, portions of any opinion may not have been summarized.)

**State v. Michael Ross II (A-79-15) (077458)**

**Argued March 27, 2017 -- Decided June 26, 2017**

**FERNANDEZ-VINA, J., writing for the Court.**

In this appeal as of right. the Court considers whether the trial court's active questioning in a first-degree murder trial constituted plain error.

Alesky Bautin and Sergey Barbashov were shot and killed on the evening of October 30, 2003. The men were sitting in Barbashov's red Volkswagen Passat outside the Forest View apartment complex in Avenel when the shooting occurred. Nearly one month earlier, defendant was stopped at a traffic signal when a car pulled up and blocked his vehicle. A passenger defendant knew only as "Mitch" got out of the car and pointed a gun at him.

On October 30, defendant was with Jamil McKnight, Sherrill Williams, and Ronald Huff. The group drove in McKnight's car to visit a friend. McKnight did not drive because of a condition that impaired his vision. Upon seeing a red car parked outside, defendant told the group that he spotted the individuals who had threatened him weeks earlier. Defendant said he wanted to go get his gun, which he had left at McKnight's house.

Before reaching McKnight's house, Huff asked to get out of the car. Williams stayed at McKnight's house while defendant and McKnight drove back to Forest View with the gun. As they passed Barbashov's car, defendant fired multiple shots into the car from approximately three to four feet away. McKnight claimed he and defendant discarded the gun before visiting a mutual friend, Greg Wakefield. McKnight admitted retrieving the gun before dawn on October 31, and that he and Williams gave the gun to a man in Queens whom he knew only as Dante.

The police received information leading to Sharhi Roberts, defendant's ex-girlfriend. Roberts was arrested on municipal court charges and agreed to give a statement in exchange for dropping the charges against her. She told police that defendant had admitted to her on two separate occasions that he committed the murders. Wakefield, who was also facing charges in an unrelated case, reluctantly gave a statement to the police in which he said that defendant had admitted to committing the murders. In September 2006, police arrested defendant.

An eight-day jury trial was held in 2008. The State presented seventeen witnesses and defendant presented three witnesses, including himself. The trial court questioned many of the witnesses. Defendant did not object at any point during trial to the court's questioning of witnesses. During the final jury charge, the judge instructed the jury that it should not be influenced by his questioning.

In its fifth day of deliberations, the jury indicated it was unable to reach a verdict, and the court delivered a Czachor charge. A juror became ill, and the judge substituted an alternate juror and instructed the jury to begin deliberations anew. The jury deliberated four additional days before convicting defendant of the first-degree murders of Bautin and Barbashov, second-degree possession of a weapon for an unlawful purpose, third-degree unlawful possession of a weapon, and third-degree hindering apprehension. Defendant moved for a new trial, but defense counsel did not challenge the trial court's questioning. The court denied defendant's motion.

The Appellate Division subsequently reversed defendant's convictions, holding that the trial court erred in substituting a juror after the jury announced it was deadlocked. The Court reversed and remanded for the Appellate Division to consider defendant's other points on appeal. 218 N.J. 130 (2014).

On remand, an Appellate Division panel rejected defendant's remaining contentions in a split decision. The majority and dissent disagreed as to whether the trial court's questioning constituted plain error. Defendant filed a notice of appeal as of right by virtue of the dissent in the Appellate Division.

1

**HELD**: Although some of the trial court's inquiries were unnecessary and over-reaching, the trial judge's conduct did not rise to the level of plain error. Upon review of the record, the Court is satisfied that the trial court's questions did not deprive defendant of a fair trial.

1. When a defendant fails to object to an error or raise an issue before the trial court, courts review for plain error and reverse only if the error was "clearly capable of producing an unjust result." R. 2:10-2. (pp 21-22)

2. Defendant suggests that his failure to object at trial is excusable because of the "awkwardness" of objecting to the trial court's conduct in front of the jury. Defendant, however, could have done so at sidebar. Defendant also contends that his failure to object at trial was justifiable because the impact of the court's questioning may not have seemed prejudicial until viewed cumulatively. In light of defendant's failure to object to the nature or scope of the trial court's questioning in his motion for a new trial, the Court is unpersuaded by this contention. (pp. 22-23)

3. Judges are authorized to question witnesses "in accordance with law and subject to the right of a party to make timely objection." N.J.R.E. 614. A trial judge may intervene to expedite the proceedings and clarify testimony. State v. O'Brien, 200 N.J. 520, 534 (2009). A trial judge may also pose questions to help elicit facts from a witness who is in severe distress. State v. Taffaro, 195 N.J. 442, 451 (2008). Although a trial judge has wide latitude to question witnesses, a judge must exercise this authority with "great restraint," especially during a jury trial. Ibid. A fine line separates proper and improper judicial questioning. A trial court crosses this line when its inquiries give the jury an impression that it takes one party's side or that it believes one version of an event and not another. In determining whether a trial judge crossed over this line, courts must examine the record as a whole. (pp 23-25)

4. The Court reviews in detail the trial court interventions challenged by defendant and finds that none constitute plain error. In contrast to Taffaro and O'Brien, the trial court in this case did not question defendant or his alibi witnesses. Rather, the trial judge interjected only during the testimony of some of the State's seventeen witnesses. And even then, the court posed few questions to the four witnesses whose testimony mattered most in resolving the primary contested issue in this case—the identity of the shooter. Although the judge was at times harsh with Roberts, defense counsel was fully able to impeach her credibility regarding defendant's alleged incriminating admissions. Moreover, the judge actually helped facilitate cross-examination of Roberts. (pp 25-32)

5. It is unlikely that the trial court's putative error led the jury to a result it otherwise might not have reached. Notably, defendant's credibility was severely impaired on cross-examination. The trial court's jury instructions also indicate that the court's intervention did not lead the jury to a result it otherwise might not have reached. On this record, where the court did not cast doubt on the credibility of defendant or underscore weaknesses in his defense, one can fairly conclude that the jury followed the judge's instructions. (pp. 32-33)

6. By intervening during defendant's trial, the trial judge in this case skirted perilously close to the fine line that distinguishes proper and improper judicial conduct. The court, however, did not cross that line. Judges must remain ever vigilant not to cross that line by asking questions that suggest a favorable impression of a party or signal doubt about a witness's credibility, or overly intervene in counsel's questioning. It bears repeating that defendant did not object at trial to the court's questioning and review is confined to the plain error standard. The Court views counsel's failure to object as an indication that counsel perceived no prejudice in the court's questioning. (p. 33)

The judgment of the Appellate Division is **AFFIRMED**.

**JUSTICE TIMPONE, DISSENTING,** expresses the view that the trial judge's extensive cross-examination of fourteen of the State's seventeen witnesses, through colloquies extending for well beyond thirty pages of transcripts, crossed that fine line that separates advocacy from impartiality. The judge sowed doubts as to defendant's theory of the case by buttressing the State's witnesses, casting doubt with his tone and manner on a critical defense-leaning witness, and testifying himself while adroitly avoiding examining defendant, according to Justice Timpone. Where the majority finds that the judge came perilously close to the line, Justice Timpone finds that he clearly crossed it, denying the defendant his due process right to a fair trial.

**CHIEF JUSTICE RABNER and JUSTICES LaVECCHIA, ALBIN, PATTERSON, and SOLOMON join in JUSTICE FERNANDEZ-VINA's opinion. JUSTICE TIMPONE filed a separate, dissenting opinion.**

STATE OF NEW JERSEY,

     Plaintiff-Respondent,

          v.

MICHAEL ROSS II,

     Defendant-Appellant.


          Argued March 27, 2017 – Decided June 26, 2017

          On appeal from the Superior Court, Appellate
          Division.

          Jay L. Wilensky, Assistant Deputy Public
          Defender, argued the cause for appellant
          (Joseph E. Krakora, Public Defender,
          attorney).

          Nancy A. Hulett, Assistant Prosecutor,
          argued the cause for respondent (Andrew C.
          Carey, Middlesex County Prosecutor,
          attorney).

          Emily R. Anderson, Deputy Attorney General,
          argued the cause for amicus curiae
          (Christopher S. Porrino, Attorney General,
          attorney).


     JUSTICE FERNANDEZ-VINA delivered the opinion of the Court.

     In this appeal as of right, we consider whether the trial

court's active questioning in a first-degree murder trial

constituted plain error.

1

A jury convicted defendant Michael Ross of committing a double murder and related offenses. The State's theory of the case was that defendant shot and killed the two victims because he mistook one of them for an individual who had previously threatened him with a firearm. At trial, defendant testified and denied involvement in the shooting.

The State presented seventeen witnesses and defendant presented three witnesses, including himself. The trial court questioned many of the witnesses. Defendant did not object at any point during trial to the court's questioning of witnesses. On appeal, however, defendant argued that the judge's questioning of a number of the State's witnesses constituted plain error.

A divided Appellate Division panel affirmed defendant's convictions. A majority of the panel acknowledged that the trial judge's conduct was a mistaken exercise of discretion, but concluded that the judge's participation did not constitute plain error. Conversely, the dissenting judge maintained that the trial court's conduct warranted reversal of defendant's convictions.

Although some of the trial court's inquiries were unnecessary and over-reaching, we conclude that the trial judge's conduct did not rise to the level of plain error. Upon review of the record, we are satisfied that the trial court's

2

questions did not deprive defendant of a fair trial. Accordingly, we affirm the judgment of the Appellate Division and uphold defendant's convictions.

I.

A.

Alesky Bautin and Sergey Barbashov were shot and killed on the evening of October 30, 2003. The men were sitting in Barbashov's red 1999 Volkswagen Passat outside the Forest View apartment complex ("Forest View") in Avenel when the shooting occurred. Nearly one month earlier, on October 1, defendant was stopped at a traffic signal in the Woodbridge area when a car pulled up and blocked his vehicle. A passenger defendant knew only as "Mitch" got out of the car and pointed a gun at him. In an attempt to avoid the confrontation, defendant drove away, hitting two other cars in the process. On October 2, defendant traveled to police headquarters and gave a statement regarding the incident. Defendant told police that the gun-waving individual drove a burgundy or maroon Ford Taurus or Mercury Sable that he had previously seen in the neighborhood.

On October 30, defendant was with Jamil McKnight, Sherrill Williams, and Ronald Huff. The group drove to Forest View in McKnight's car to visit a friend. McKnight did not drive because of a condition that impaired his vision. Upon seeing a red car parked outside one of the apartment buildings, defendant

3

told the group that he spotted the individuals who had threatened him weeks earlier. Defendant said he wanted to get his gun, which he had left at McKnight's house. Defendant also described the individuals in the car, including Mitch, as black males.

Before reaching McKnight's house, Huff asked to get out of the car. Williams stayed at McKnight's house while defendant and McKnight drove back to Forest View with the gun. As they passed Barbashov's car, defendant fired multiple shots into the car from approximately three to four feet away. McKnight claimed he and defendant discarded the gun before visiting a mutual friend, Greg Wakefield. McKnight admitted retrieving the gun before dawn on October 31, and that he and Williams gave the gun to a man in Queens whom he knew only as Dante.

Huff, who was walking around the neighborhood at the time of the shooting, heard multiple shots. Walking in the direction of the shooting, Huff approached Barbashov's car and saw Bautin, who appeared to be dead, and Barbashov, who was still alive. Huff heard sirens and told Barbashov that help was on the way. Officer Christopher Lyons of the Woodbridge Police Department responded to the shooting. When he arrived at the scene, he found Bautin dead with a bullet hole at the base of his skull behind his ear lobe. Lyons found Barbashov alive in the driver's seat and called for an ambulance. Responders

4

transported Barbashov to the hospital for emergency surgery, but doctors there were unable to save him.

Several spent shell casings and bullets were found in and around Barbashov's vehicle. Gary Mayer, a forensics ballistics investigator, determined that the spent shells, bullets, and fragments recovered from the scene had all been fired from the same nine-millimeter firearm. Mayer examined a nine-millimeter Glock handgun belonging to Barbashov's business partner and concluded that the rounds at the scene were not fired from that gun.

With no further leads, the investigation stalled. Eventually, the police received information leading to Sharhi Roberts, defendant's ex-girlfriend. Roberts was arrested on municipal court charges and agreed to give a statement to police in exchange for dropping the charges against her. Roberts told police that defendant had admitted to her on two separate occasions that he committed the murders.

Wakefield, who was also facing charges in an unrelated case, reluctantly gave a statement to the police in which he said that defendant had admitted to committing the murders. Wakefield did not have an attorney present when he gave his first statement to the police, and averred at trial that authorities pressured him to implicate defendant. Sergeant Mark Clements, who investigated the crime on behalf of the Middlesex

County Prosecutor's Office, stated that Wakefield was with authorities for approximately seven and one-half hours on the date he gave his first statement and took a polygraph exam.

In September 2006, nearly three years after the October 30 shooting, police arrested defendant. McKnight was arrested in New York for disposing of the firearm that had been used in the shootings, and defendant was arrested three days later for the murders. Police never recovered the murder weapon.

B.

In October 2006, a Middlesex County grand jury issued an indictment charging defendant with two counts of first-degree murder, contrary to N.J.S.A. 2C:11-3(a)(1) and (a)(2); second-degree possession of a weapon for an unlawful purpose, contrary to N.J.S.A. 2C:39-4(a); third-degree unlawful possession of a weapon, contrary to N.J.S.A. 2C:39-5(b); and third-degree hindering apprehension, contrary to N.J.S.A. 2C:29-3(b)(3).

An eight-day jury trial was held in 2008. On April 1, the State called the first of its seventeen witnesses. Officer Vincent Totka, who investigated the October 1 gun-waving incident, was the first witness to testify. The trial judge asked Officer Totka, who took defendant's statement the day after the incident, a brief series of questions to establish defendant's age at the time of questioning and to clarify why defendant's father was not in the room when the officer took

6

defendant's statement regarding the gun-waving episode. Totka responded that defendant was twenty-one years old at the time and that parental consent was not needed.

Detective Michael Ng, who investigated the motor vehicle accident resulting from defendant's driving away from Mitch, was the second witness to testify. The trial court posed several questions to Ng, whose responses established that the police asked defendant's father to have defendant contact them about the accident and that defendant came to the station the following day. Following Ng's testimony, a Verizon employee and a New Jersey State Police lieutenant testified regarding the 911 call made on the night of the murders. The trial court asked those two witnesses limited questions. Bautin's brother and Barbashov's girlfriend were the next witnesses to testify, and the court posed only a few questions.

On the second day of trial, the State called Huff, who had been in the car with defendant, McKnight, and Williams on the evening of the murders. Huff described what he witnessed that night and testified as to what he told the police in response to their questioning during the investigation. During his direct testimony, Huff referred to defendant and McKnight by their nicknames and denied knowledge of their real names. During cross-examination, defendant responded to questions using defendant and McKnight's real names. After cross-examination,

7

the court had Huff clarify that he knew their real names only at the time of trial and not previously:

> [Court]:  So, in other words, you know who the real name of Sagacious is now?
>
> [Huff]:  I do not, no.
>
> [Court]:  Now?
>
> [Huff]:  Now.
>
> [Court]:  That is what I'm saying.
>
> [Huff]:  Jamil, whatever his name is.
>
> [Court]:  Do you know his last name now?
>
> [Huff]:  If they say it again I'll know.
>
> [Court]:  Did the attorney just ask you about McKnight?
>
> [Huff]:  Jamil McKnight.  Yes.
>
> [Court]:  Jamil McKnight?
>
> [Huff]:  Jamil McKnight.  Like I said, I don't know his real name.
>
> [Court]:  But you think that's his real name now?
>
> [Huff]:  Yes.

The judge also asked Huff some questions regarding the details of the night of the murders, including the weather conditions and the lighting.

Next, the State called Roberts, defendant's former girlfriend who previously informed police that defendant had confessed to her.  In her testimony, Roberts stated for the

8

first time that defendant told her that he "made up" his story about committing the shootings. Roberts also testified that the police pressured her into implicating defendant, and the court directed her to answer defense counsel, who had asked her to recount specific instances of harassment:

> [Defense Counsel]: Can you describe for the jury the manner in which they harassed you with as much specificity as you can.
>
> [Roberts]: Okay. They came to my house. I've been evicted from places.
>
> [Court]: I'm sorry. Came to your house and what?
>
> [Roberts]: They came to my house. Harassed me numerous times.
>
> [Court]: In other words, the question is we need specifics. What did they do? Specifically, what did they do? What did they say? What did they do?
>
> [Roberts]: Well --
>
> [Court]: Okay.
>
> [Roberts]: They --
>
> [Court]: They came to your house. What else?

At that point, Roberts gave a more detailed answer. Shortly thereafter, defense counsel asked Roberts a question that prompted an objection from the State and a sidebar discussion. After concluding the discussion at sidebar and before defense counsel resumed cross-examination, the following colloquy took place:

9

[Court]: All right. Now, Miss Roberts, you have to listen to the questions of [defense counsel] very carefully. All right?

[Roberts]: Okay.

[Court]: You listen to the question and you think and you only answer his question.

[Roberts]: Okay.

[Court]: Try to focus on his question and then try to give a specific answer to that question. Right? Could you do that?

[Roberts]: Yes.

[Court]: I appreciate it. Thank you very much. Yes, [defense counsel].

[Defense Counsel]: All right. Sharhi, describe how you were harassed. I don't just mean the cops showed up. How many times did they come, what did they say to you and so forth, things like that.

[Roberts]: They came numerous times.

[Court]: Came where, ma'am?

[Roberts]: To my house, to my job. They waited in the parking lot of my job. They came into my job, gave false statements about me.

[Defense Counsel]: What statements did they make about you?

[Prosecutor]: Judge, that's hearsay. It's hearsay.

[Court]: Overruled.

The defense then attempted to draw out Roberts's assertions about police harassing her into making a statement, and Roberts

10

answered defense counsel's question regarding the timing of the alleged harassment:

> [Defense Counsel]: Okay. So when's the first time that you can remember the police coming to you and harassing you?
>
> [Roberts]: The first time I remember was my father's house.
>
> [Court]: When? When? When? When? Not where.
>
> [Roberts]: I can't remember the exact day.
>
> [Court]: Well, was it like -- was it before . . . October 30, 2003, or was it after October 30?
>
> [Roberts]: It was after.
>
> [Court]: Was it a month after, a year after?
>
> [Roberts]: A year, a year -- almost two years -- it was a little after November, I want to say -- I want to say '05 --
>
> [Court]: Okay.
>
> [Roberts]: -- 6, November.
>
> [Court]: November 2005.

The court also guided Roberts when answering defense counsel's questions regarding her police interview, whether she had an unrecorded pre-interview, and whether she had an attorney present. During defense counsel's cross-examination and recross-examination of Roberts, the court frequently overruled the State's objections.

11

The next witness to testify was Officer Lyons, who responded to the scene of the shooting. The trial court posed several questions regarding Lyons's efforts to secure the crime scene, the lighting conditions, and other details about the scene. The court also asked several clarifying questions:

> [Defense Counsel]: Do you ever recall telling a witness they were going to be a witness or they were going to get a green sheet? Do you recall any of this?
>
> [Court]: Hold on. Do you recall any of that, sir?
>
> [Lyons]: I believe you're asking the same question again, sir.
>
> [Defense Counsel]: No, I'm not.
>
> [Court]: Specific words.
>
> [Lyons]: Okay. I don't recall.

Following Lyons's testimony, John Haley, a retired officer from the Middlesex County Prosecutor's Officer who responded to the scene of the shootings, testified regarding the evidence gathered from the scene. After cross-examination, the court engaged in a colloquy with Haley about how the crime scene was processed.

The State later called Roberts's attorney, who rebutted Roberts's assertion that he had advised her not to tell police that defendant recanted his confession to her. The trial court did not ask any questions during direct or cross-examination.

12

The State then called McKnight to describe what happened the night of the double homicide. The court's intervention was limited -- the judge asked McKnight to repeat or clarify a few points to ensure that the court's notes were accurate.

The State called Mayer, from the Somerset County Prosecutor's Office, to testify whether the firearm from Barbashov's business partner matched the shell casings recovered from the scene. During direct examination, the court asked Mayer to clarify his testimony that two guns made by the same manufacturer would have different markings in the barrel and to explain what Mayer meant when he referred to "lands" and "grooves." The court also elicited the location of the evidence vault of the forensic ballistic unit. In addition, the court asked Mayer to clarify the term "proved positive" and how the forensic ballistics unit labels evidence. The court also clarified a few questions asked by the prosecutor, including whether Mayer had the ability to compare lead fragments in the case microscopically, not whether he actually did; and whether Mayer could list, "for the record," the major gun manufacturers capable of firing the projectiles found in this case.

After a brief cross-examination, the court engaged in a colloquy with Mayer. The court asked about the differences between a revolver, a semi-automatic weapon, and an automatic weapon. The judge also asked about how many weapons were used

13

and which casings matched.  In addition, he asked Mayer about the significance of the term "Luger" and what happens to a projectile when it is fired from a weapon.  The prosecutor asked additional questions after the court's colloquy with Mayer, but defense counsel declined the opportunity to further cross-examine Mayer.

Wakefield, who was with defendant the evening of October 30 before the murders, also testified.  Wakefield stated that authorities pressured him to implicate defendant.  The court's questioning of Wakefield was limited.  Sergeant Clements of the Middlesex County Prosecutor's Office testified on behalf of the State regarding his role in the investigation of the double homicide.  Clements rebutted Wakefield's testimony that he had been pressured to give a statement to the police.  Defense counsel cross-examined Clements on how much time Wakefield had been in custody before providing a formal statement, and how much time Wakefield spent with the polygraph examiner before providing the statement.  The judge interrupted and, at sidebar, told counsel that Clements, who was not present during the polygraph, could not possibly know about the procedures employed by the examiner that night.

During redirect, the prosecutor established that Clements did not know how long a polygraph examiner would spend explaining the test or administering preliminary questions

14

before beginning the actual examination.  In a recross examination, of Clements, defense counsel established that Wakefield was in police custody for an extended period of time suggesting that Wakefield's disclosure was the result of aggressive interrogation from the police.  After redirect and recross, the court asked if the polygraph examination was administered in a separate room and established that Clements and Lyons were not present during the administration of the test.  Both the prosecutor and defense counsel asked follow-up questions after the court's inquiries.

The State also posed questions to the medical examiners who performed the autopsies on Barbashov and Bautin.  After defense counsel declined to cross-examine both witnesses, the court engaged in questioning of Dr. Frederick DiCarlo, who performed the autopsy on Bautin, and Dr. Andrew Falzon, who performed the autopsy on Barbashov.  After defense counsel declined to cross-examine Dr. Falzon, the following colloquy took place:

> [Court]:  All right.  So, the cause of death is gunshot wounds, right?
>
> [Dr. Falzon]:  Correct.
>
> [Court]:  Which -- what's the mechanism of death?
>
> [Falzon]:  The mechanism would be shock.
>
> [Court]:  You have to tell the jury.

15

[Falzon]: The mechanism of death would be shock. Basically when a person sustains gunshot wounds in a case like this, they are bleeding internally. And they go into what we term as hemorrhagic shock where there is not enough blood left in the vascular system to sustain life.

[Court]: All right. You're saying shock is equated with loss of blood?

[Falzon]: Correct.

[Court]: And what -- how do you classify this?

[Falzon]: The manner of death?

[Court]: Yeah, manner of death.

At this point, the prosecutor asked for a sidebar, during which the parties agreed that the manner of death was the province of the jury and should not be elicited by the judge. The court then asked one question regarding the time of death, and gave both parties the chance to ask follow-up questions. Both the prosecutor and defense counsel declined.

After the State rested, the defense called three witnesses: a private investigator hired by defense counsel; defendant's friend, Chaney McPhatter; and defendant himself. The defense called Chaney McPhatter as an alibi witness, and she testified that she thought she remembered seeing defendant at her house on the night of the murders. On cross-examination, the State highlighted that McPhatter was only thirteen years old at the time of the murders and confronted her with a statement in which

16

she told investigators that she did not recall defendant visiting that night at all.

In his testimony, defendant described the October 1 gun-waving incident. He denied that Mitch was involved and stated that the gun-waving assailant exited a Taurus or Sable. Defendant acknowledged knowing that Mitch drove a 1988 red Volkswagen Jetta. Defendant testified that on the night of the murders, he was driving with McKnight, Williams, and Huff when they saw a Taurus leaving Forest View. McKnight suddenly asked to return home. When they arrived there, Huff left and McKnight entered his house, returning to the car with something wrapped in a bandana. Defendant believed it was a gun. Defendant drove to the house of a friend, Latoya McPhatter, Chaney McPhatter's older sister. Leaving McKnight and Williams in the car, defendant briefly stayed at Latoya McPhatter's house. Defendant then walked to Wakefield's house, where McKnight arrived later. Defendant denied shooting the victims.

During cross-examination, it was revealed that authorities recorded a telephone conversation defendant had with his father while incarcerated in 2006 without defendant's knowledge. Defendant told his father he was not in Middlesex County at all on the night of the murders. He also told his father that Mitch was, in fact, involved in the October 1, 2003 incident.

17

The trial court did not engage in independent questioning of defendant, Chaney McPhatter, or the private investigator.

During the final jury charge, the judge instructed the jury that it should not be influenced by his questioning:

> [T]he fact that I may have asked questions of a witness or different witnesses in the case must not influence you in any way in your deliberations. The fact that I asked questions does not indicate that I hold any opinion one way or the other as to the testimony given by the witness.

In its fifth day of deliberations, the jury indicated it was unable to reach a verdict, and the court delivered a Czachor charge.[1] A juror became ill, and, after dismissing that juror the following day, the judge substituted an alternate juror and instructed the jury to begin deliberations anew.

The jury deliberated over the course of four additional days before convicting defendant of the first-degree murders of Bautin and Barbashov, second-degree possession of a weapon for an unlawful purpose, third-degree unlawful possession of a weapon, and third-degree hindering apprehension.

Defendant moved for a new trial before sentencing, but defense counsel did not challenge the trial court's questioning. After denying defendant's motion for a new trial, the court sentenced defendant to two consecutive life terms on the murder

---

[1] State v. Czachor, 82 N.J. 392 (1980).

counts, each subject to the No Early Release Act, N.J.S.A. 2C:43-7.2, and a consecutive five-year term on the hindering charge.

The Appellate Division subsequently reversed defendant's convictions, holding that the trial court erred in substituting a juror after the jury announced it was deadlocked. We reversed and remanded for the Appellate Division to consider defendant's other points on appeal. State v. Ross, 218 N.J. 130 (2014).

On remand, an Appellate Division panel rejected defendant's remaining contentions in a split decision. The majority and dissent disagreed as to whether the trial court's questioning constituted plain error. Defendant filed a notice of appeal as of right by virtue of the dissent in the Appellate Division. N.J. Const. art. VI, § V, ¶ 1(b).

Because the parties are limited to the issues raised by the dissent, R. 2:2-1(a)(2), the sole issue in this appeal is whether the trial court's questioning rose to the level of plain error. The Court granted the Attorney General amicus curiae status.

## II.

Defendant argues that the trial court's excessive involvement warrants reversal as plain error. He posits that "this case presents a distortion, if not a breakdown, of the carefully circumscribed roles of the participants in a trial

19

that define our adversary system."  Defendant emphasizes that a trial judge may only intervene to expedite the proceedings, clarify testimony, or assist a witness or counsel in distress. Defendant avers that the trial court's inquiries did not fit within these limited purposes.

Recognizing that he did not object at trial, defendant claims the lack of objection below is not an impediment to reversal.  Citing State v. Taffaro, 195 N.J. 442 (2008) and State v. O'Brien, 200 N.J. 520 (2009), defendant notes that this Court has previously granted reversal as a matter of plain error where a trial court questioned witnesses.  In addition, defendant highlights the "awkwardness" of objecting to a trial court's intervention at trial and asserts that the impact of the court's questioning may not have seemed prejudicial until viewed cumulatively.

Defendant points out several instances in which the trial court's questioning of witnesses was improper.  Specifically, defendant references the court's inquiries of Officers Totka and Ng, Huff, Roberts, Wakefield, Mayer, and the medical examiners. Defendant maintains that the trial court's extensive questioning of those witnesses mandates reversal of his convictions.

The State notes that defendant did not object to the court's questioning at trial.  The State contends that defendant's failure to object at trial demonstrates that he did

20

not view the court's intervention to be prejudicial.  The State submits that the court's questions were primarily clarifying in nature and that the court posed few questions to the witnesses most pivotal to the State's case.  The State also distinguishes Taffaro and O'Brien on the basis that the court did not make any inquiries of defendant or his alibi witness.  The Attorney General agrees with the State that the trial court's intervention did not give rise to plain error.

### III.

### A.

When a defendant fails to object to an error or raise an issue before the trial court, we review for plain error.  R. 2:10-2.  We may reverse on the basis of unchallenged error only if the error was "clearly capable of producing an unjust result."  Ibid.  "The possibility of an unjust result must be 'sufficient to raise a reasonable doubt as to whether the error led the jury to a result it otherwise might not have reached.'"  State v. Williams, 168 N.J. 323, 336 (2001) (quoting State v. Macon, 57 N.J. 325, 336 (1971)).  A defendant who does not raise an issue before a trial court bears the burden of establishing that the trial court's actions constituted plain error.  State v. Weston, 222 N.J. 277, 295 (2015).  A defendant assumes this burden because "to rerun a trial when the error could easily have been cured on request, would reward the litigant who

21

suffers an error for tactical advantage either in the trial or on appeal." Id. at 294-95 (quoting Macon, supra, 57 N.J. at 333).

Defendant suggests that his failure to object at trial is excusable because of the "awkwardness" of objecting to the trial court's conduct in front of the jury. Defendant, however, need not have objected to the trial court's questioning in front of the jury and could have done so at sidebar. In fact, during the trial court's questioning of Dr. Falzon, the State requested a sidebar and challenged the propriety of the court's inquiry to the medical examiner about Barbashov's manner of death. After this exchange at sidebar, the court asked only one question regarding the time of death. That the State raised an issue as to the trial court's questioning at sidebar, which had the effect of curtailing further intervention from the court, convinces us that defendant's capacity to object at trial was not as precarious as he and our dissenting colleague attempt to portray.

Defendant also contends that his failure to object at trial was justifiable because the impact of the court's questioning may not have seemed prejudicial until viewed cumulatively. In light of defendant's failure to object to the nature or scope of the trial court's questioning in his motion for a new trial, we are unpersuaded by this contention. Because defendant failed to

22

object to the trial court's questioning, we analyze his claim in this appeal through the lens of plain error review.

B.

The New Jersey Rules of Evidence explicitly permit trial judges to interrogate witnesses.  Judges are authorized to question witnesses "in accordance with law and subject to the right of a party to make timely objection."  N.J.R.E. 614. Indeed, we have recognized that the discretionary power of a judge to participate in the development of proof is of "high value."  State v. Guido, 40 N.J. 191, 207 (1963).  A trial judge may intervene to expedite the proceedings and clarify testimony. O'Brien, supra, 200 N.J. at 534.  A trial judge may also pose questions to help elicit facts from a witness who is in severe distress.  Taffaro, supra, 195 N.J. at 451.

Although a trial judge has wide latitude to question witnesses, a judge must exercise this authority with "great restraint," especially during a jury trial.  Ibid.  A judge must use considerable care when questioning witnesses to avoid influencing the jury.  Ibid.  There is a grave risk that a trial court may influence a jury through its questioning by signaling doubt about a witness's credibility or suggesting that it favors one side over the other.  See O'Brien, supra, 200 N.J. at 523 (noting that judge "holds powerful symbolic position vis-a-vis jurors . . . and must refrain from any action that would suggest

23

that he favors one side over the other, or has a view regarding the credibility of a party or a witness"). A fine line separates proper and improper judicial questioning. A trial court crosses this line when its inquiries give the jury an impression that it takes one party's side or that it believes one version of an event and not another. See Taffaro, supra, 195 N.J. at 451 (citing Village of Ridgewood v. Sreel Inv. Corp., 28 N.J. 121, 132 (1958)).

In determining whether a trial judge crossed over this line, we must examine the record as a whole. See id. at 454. "[I]t is the impact of the court's questions, and not the number of minutes they lasted, which matters most." Ibid. With these legal principles in mind, we assess whether defendant has met his burden of establishing that the trial court's actions constituted plain error.

IV.

A.

Defendant challenges the trial court's queries to the first two witnesses to testify on behalf of the State, Officers Totka and Ng. We find the court's eliciting defendant's age at the time of his interview with police regarding the gun-waving incident and the reason defendant's father was not in the room to be nothing more than an innocuous intervention. Although it was not necessary for the trial court to draw out this

24

information, the court's intervention did not indicate to the jury that it held a favorable view of Officer Totka or that it favored the State's case. In addition, the purpose of Officer Totka's testimony was to describe the gun-waving incident as a basis for defendant's motive for the October 30 shooting. The trial court's questions were clearly tangential to the crux of Officer Totka's testimony as they did not convey to the jury information about defendant's motive.

As to Officer Ng, defendant claims the trial court's inquiries had the effect of highlighting defendant's failure to report the gun-waving incident immediately or voluntarily. Like Officer Totka, Officer Ng testified for the limited purpose of establishing defendant's motive for the October 30 shooting. The court's questions were peripheral to this underlying purpose and did not strike at the heart of Officer Ng's testimony. In short, although the trial court's intervention after both officers were cross-examined was unnecessary, it was not damaging to defendant.

Because the judge asked limited questions of the Verizon employee and of the state trooper, defendant does not focus on these witnesses, and next challenges the court's intervention during Huff's testimony. We fail to discern how the trial court prejudiced defendant by clarifying that Huff learned the real name of Jamil McKnight only at the time of trial. Defendant

25

also highlights the court's questioning of Huff about the lighting conditions and avers that this effectively supported the State's theory that he sought to exact revenge on Mitch, but mistakenly shot two innocent individuals.  However, this questioning could also have buttressed defendant's theory of the case that it was McKnight, a man with poor eyesight, who mistakenly shot the victims.  Thus, whether the court's questioning of Huff had an adverse effect on defendant's case is speculative at best.[2]  Because we may reverse on the basis of unchallenged error only if the error was "clearly capable of producing an unjust result," R. 2:10-2, the court's questioning of Huff does not mandate reversal.

B.

Turning to defendant's claim that the trial judge's "harshest intervention was reserved for Sharhi Roberts," it is difficult to assess from the record the harshness of this

---

[2] The dissent asserts that the court's questioning of Huff is of "particular concern" because the judge acted as a second prosecutor "to elicit testimony to dispel the theory posed by defense counsel that the poor-visioned McKnight was the shooter who mistook the red Passat for a maroon Mercury."  Post at ____ (slip op. at 16-18).  Specifically, the dissent highlights the judge's remark, "[o]f course there were lights on," after Huff mentioned it was dark.  The dissent concludes that this exchange favored the State.  The court's remark favors neither since both the defense's and prosecution's theories were that the shooting occurred based on an inability to make observations. Additionally, the dissent raises the argument that the judge in so stating testified on the State's behalf in questioning Huff despite defendant's never having advanced that argument.

26

intervention. Nonetheless, the judge's questioning of Roberts was proper as it fell squarely within the well-recognized judicial role of clarifying testimony.

Significantly, the trial judge's exchange with Roberts, who was a State witness, took place while defense counsel was cross-examining her. The court guided Roberts to answer defense counsel, who had asked Roberts to describe with "as much specificity" as possible how Officers Clements and Lyons had harassed her. When Roberts simply replied, "[t]hey came to my house. I've been evicted from places," the court intervened and told her that counsel's question called for specifics. Roberts only provided a detailed answer to defense counsel's question after the court guided her to answer the question with the specific information that counsel was asking her to provide.

In addition, before defense counsel resumed his cross-examination of Roberts, the trial court instructed Roberts that she had "to listen to the questions of [defense counsel] very carefully" and she had to "think" and "answer his question." Contrary to defendant's contentions, the court was not acting as an advocate for the State, and any "harshness" toward Roberts stemmed from the State's witness not being responsive to defense counsel's questioning. If anything, the court's admonitions to the witness had the effect of facilitating defense counsel's

27

cross-examination of a non-responsive witness testifying on behalf of the State.

Defendant also maintains that the court's impatience with Roberts signaled doubt about her claims of harassment. The record does not support this interpretation. In fact, the court repeatedly overruled the State's objection to defendant's line of inquiry in an attempt to permit its full development. Because the trial court's intervention with Roberts was unlikely to affect the result when viewed in the context of her testimony as a whole, we do not find that intervention to rise to the level of plain error. That defendant himself characterizes the trial court's treatment of Roberts as its "harshest intervention" foretells the difficulty defendant encounters in showing plain error as to the court's questioning of the other witnesses.

### C.

The trial court also extensively questioned the State's forensic ballistics expert and the two medical examiners who performed the autopsies on the victims. Although the trial court heavily intervened during this testimony, it's questions were harmless. Indeed, the court's questioning was largely gratuitous and, as the Appellate Division correctly recognized, "the questions . . . seemingly served only to display the judge's personal knowledge of the subject matters involved."

28

Accordingly, although the court acted imprudently when questioning these witnesses, the effect of the questioning was neither prejudicial to defendant nor supportive of the State. Because "it is the impact of the court's questions, and not the number of minutes they lasted, which matters most," defendant's emphasis on the amount of questions the court posed to these witnesses is unavailing. Taffaro, supra, 195 N.J. at 451.[3]

D.

Finally, defendant relies on Taffaro and O'Brien, in which the trial judge's conduct constituted plain error. Taffaro and O'Brien, however, are readily distinguishable from the case at bar. In Taffaro, supra, the trial judge extensively questioned the defendant in a manner that "underscored the weaknesses in his defense." Id. at 448, 452. As we explained, "the questions had the effect of suggesting to the jury that the [trial] court doubted defendant's account in a case that rested heavily on defendant's credibility." Id. at 453.

Likewise, in O'Brien, supra, the trial judge engaged in lengthy questioning of the defendant and key defense witnesses. 200 N.J. at 526-33. The defendant in O'Brien confessed to

---

[3] The dissent similarly makes much of the fact that the trial court asked a multitude of questions to numerous witnesses. In doing so, the dissent erroneously gives short shrift to Taffaro's instruction that we must determine the prejudicial impact of the court's questioning in the context of the trial as a whole.

29

fatally shooting his parents, and his sole defense at trial was diminished capacity. Id. at 524-25. In advancing his diminished capacity defense, the defendant presented a psychiatrist as an expert witness. Id. at 525. We concluded that the questions the trial judge posed to defendant's medical expert were "damaging to the overall fairness of the trial" because they "[e]xpress[ed] clear disbelief in the witness's conclusions." Id. at 538. As to the trial court's questioning of the defendant, we determined that "the only inference [the jury] could draw from the judicial intervention was that [the] defendant's testimony probably was not true." Id. at 537-38. Moreover, the trial court questioned one of the State's investigators in such a way that it "effectively hammered nails into defense counsel's ongoing cross-examination and bolstered the State's witness." Id. at 539. Encountering a trial judge "who appeared to disbelieve [the defendant] and his expert witness, revealed that disbelief to the jury, and supported a witness adverse to [the defendant]," this Court had little difficulty in finding plain error. Id. at 539-40.

In contrast to Taffaro and O'Brien, the trial court in this case did not question defendant or his alibi witnesses. Rather, the trial judge interjected only during the testimony of some of the State's seventeen witnesses. And even then, the court posed few questions to the four witnesses whose testimony mattered

30

most in resolving the primary contested issue in this case -- the identity of the shooter.  The trial judge asked only a few questions of Huff, McKnight, and Wakefield, who were with defendant on the night of the murders.

Although the judge was at times harsh with Roberts, defense counsel was fully able to impeach her credibility regarding defendant's alleged incriminating admissions.  Unlike the trial judge in O'Brien, supra, who "effectively hammered nails" into defense counsel's cross-examination of a State witness, the trial judge here accorded defense counsel flexibility in cross-examining Roberts, as demonstrated by his repeated rejection of the prosecutor's objections.  Moreover, the judge actually helped facilitate defense counsel's cross-examination of Roberts.  Defendant's comparison with Taffaro and O'Brien as support for his position falls short because those cases are plainly distinguishable.

Furthermore, it is unlikely that the trial court's putative error "led the jury to a result it otherwise might not have reached."  Williams, supra, 168 N.J. at 336 (quoting Macon, supra, 57 N.J. at 336).  Notably, defendant's credibility was severely impaired on cross-examination.  After testifying that he was at Latoya McPhatter's house when the shootings occurred, the State confronted defendant with his jailhouse call to his

31

father in which he stated he was not in Middlesex County on the night of the murders.

The trial court's jury instructions also indicate that the court's intervention did not lead the jury to a result it otherwise might not have reached.  The last witness called by the State, and the last witness to whom the judge posed any questions, testified on April 10, 2008.  The last witness, defendant, testified on April 15.  Before the jury began its deliberations on April 16, the trial judge carefully instructed the jury that the questions he posed to witnesses should not influence them.  After extensive deliberations, the jury announced its verdict on April 29, nearly three weeks after the court asked its last question.  In an egregious case of judicial intervention, a jury instruction may be insufficient to offset the prejudicial effect of improper questioning by the court. See Taffaro, supra, 195 N.J. at 448, 454.  On this record, where the court did not cast doubt on the credibility of defendant or underscore weaknesses in his defense, we can fairly conclude that the jury followed the judge's instructions.  See State v. Loftin, 146 N.J. 295, 390 (1996) ("That the jury will follow the instructions given is presumed.").

Averring that this was a very close case, the dissent suggests that the jury's deliberation over five days illustrates that the judge placed his thumb on the scale.  Courts are not

32

able to draw accurate inferences from the length of deliberations. The only observation we can make from the deliberations is that the jury spent five days weighing the evidence. Thus, the dissent's reliance on the jury's deliberations to show that the trial court placed its thumb on the scale is unavailing.

V.

By intervening during defendant's trial, the trial judge in this case skirted perilously close to the fine line that distinguishes proper and improper judicial conduct. The court, however, did not cross that line. We emphasize that judges must remain ever vigilant not to cross that line by asking questions that suggest a favorable impression of a party or signal doubt about a witness's credibility, or overly intervene in counsel's questioning.

Here, it bears repeating that defendant did not object at trial to the court's questioning and our review is confined to the plain error standard. We view counsel's failure to object as an indication that counsel perceived no prejudice in the court's questioning. After a careful review of the record, we cannot discern any prejudice that would warrant reversal of defendant's convictions.

VI.

33

Accordingly, we affirm the judgment of the Appellate Division and uphold defendant's convictions.


CHIEF JUSTICE RABNER and JUSTICES LaVECCHIA, ALBIN, PATTERSON, and SOLOMON join in JUSTICE FERNANDEZ-VINA's opinion. JUSTICE TIMPONE filed a separate, dissenting opinion.

34

STATE OF NEW JERSEY,

    Plaintiff-Respondent,

       v.

MICHAEL ROSS II,

    Defendant-Appellant.

    JUSTICE TIMPONE, dissenting.

Walk into any trial courtroom in this State -- whether furnished in gray gunmetal or carved wood -- the centerpiece is the judge's bench, rising above all else and all others. That is not happenstance. The message is clear: the judge presides; the judge decides; the judge has the final word.

Trial lawyers are well aware of a judge's impact on a sitting jury. Judges dote on jurors. They generally exhibit kindness and understanding toward jurors, making them feel welcome and part of the process. Judges often banter with jurors, recognize when they need a break, and try to accommodate their schedules. As jurors enter and exit the courtroom, many judges stand in deference. Notably, jurors return the deference. Jurors may raise an eyebrow at the lawyers' arguments and examinations but they usually take a judge's pronouncements as gospel. When a judge speaks, jurors listen.

1

Jurors do not see judges as partisans; they view the judges as impartial decision-makers who have no stake in the outcome of the trial.  When a judge drifts from being a pillar of neutrality, most jurors do not recognize the drift but do recognize the subtle cues.  Often the drift is inadvertent, singular in nature, and harmless.  But not in this case.

Here, the trial judge's extensive cross-examination of fourteen of the State's seventeen witnesses, through colloquies extending for well beyond thirty pages of transcripts, "cross[ed] that fine line that separates advocacy from impartiality."  Ridgewood v. Sreel Inv. Corp., 28 N.J. 121, 132 (1958).  His cumulative actions created sufficient reasonable doubt as to whether the errors "led the jury to a result it otherwise might not have reached."  State v. Macon, 57 N.J. 325, 336 (1971).  The judge's unrelenting questioning prejudiced defendant and, therefore, is plain error that warrants the reversal of defendant's conviction.  R. 2:10-2.

As a result, I cannot stand with the majority, and I respectfully dissent.

                              I.
"The trial judge is an imposing figure.  To the jurors he is a symbol of experience, wisdom, and impartiality.  If he so intervenes as to suggest disbelief, the impact upon the jurors may be critical."  State v. Guido, 40 N.J. 191, 208 (1963); see

2

Ridgewood, supra, 28 N.J. at 132; Macon, supra, 57 N.J. at 336. Legal scholars have long been conscious of the impact judges have on juries. See, e.g., Peter David Blanck et al., The Appearance of Justice: Judges' Verbal and Nonverbal Behavior in Criminal Jury Trials, 38 Stan. L. Rev. 89, 89 (1985) (studying relationship between trial judge's "'appearance,' or conduct and behavior" and jury's verdict).

Shortly after the trial of this matter, this Court reaffirmed Guido in State v. Taffaro, 195 N.J. 442 (2008) and State v. O'Brien, 200 N.J. 520 (2009). Although those cases are not binding as to the matter at hand, they demonstrate this Court's continued support of the long-standing limits on judicial advocacy.

The O'Brien Court explained the scope of N.J.R.E. 614 and elucidated the appropriate circumstances under which a trial judge should interject and ask questions -- namely, when a party's basic rights are being threatened, when it is necessary to expedite the trial and prevent waste, or to clarify when a witness has trouble articulating an answer. O'Brien, supra, 200 N.J. at 534. When a judge goes beyond those confines, the Court determined, a defendant may be deprived of a fair trial "[i]n light of the trial judge's esteemed position in the courtroom." Taffaro, supra, 195 N.J. at 454. Indeed, with respect to a witness whose credibility played a "central role" in the trial,

3

the Court reasoned that the judge's "suggesting disbelief of [the witness's] testimony could well have had a critical impact on the verdict."  Ibid.

In O'Brien, we vacated a defendant's conviction for murdering his parents because of the invasive role the judge played at trial.  O'Brien, supra, 200 N.J. at 541.  There, the defendant confessed to shooting his parents and asserted a defense of diminished capacity based on drug intoxication and depression.  Id. at 523, 525.  We found improper the trial court's direct questioning of the defendant, who had already been extensively examined about his memory of the events; the court's questioning of the expert witness regarding memory loss from the defendant's addiction to marijuana; and the court's questioning of an officer's experience.  Id. at 526-27.  The trial court's "rapid-fire" questioning of the defendant "hammer[ed] home the prosecutor's view of [the] defendant's memory as selective, and [left] the impression that [the court] did not believe [the] defendant's claim."  Id. at 537.

We explained that when a judge questions a witness who has already given "perfectly plain" answers, it "strongly suggest[s] to the jury that [the witness] is not to be believed."  Ibid. Similarly, with regard to the expert witness, the trial court "[e]xpress[ed] clear disbelief in the witness's conclusions." Id. at 538.  Ultimately, we found the judge's excessive

4

questioning "damaging to the overall fairness of the trial," and that defendant was "entitled to face a single adversary, the State." Id. at 537, 539. Accordingly, we found that a new trial was proper because the defendant "should not have had to bear the consequences of a judge who appeared to disbelieve him and his expert witness, revealed that disbelief to the jury, and supported a witness adverse to him." Id. at 539-40.

Federal courts have applied the same constraints to the analogous Federal Rule of Evidence 614. The Third Circuit explained that "[j]udges must be especially careful about their conduct during trial because they hold a position of special authority and credibility in the eyes of the jury" and cross-examination by the court "can prove fatal to a witness's credibility." United States v. Ottaviano, 738 F.3d 586, 595 (3d Cir. 2013), cert. denied, 134 S. Ct. 1922, 188 L. Ed. 2d 945 (2014). "[C]ross-examination of a witness by the trial judge is potentially more impeaching than such an examination conducted by an adversary attorney." United States v. Godwin, 272 F.3d 659, 678 (4th Cir. 2001), cert. denied, 535 U.S. 1069, 122 S. Ct. 1942, 152 L. Ed. 2d 846 (2002).

The federal courts warn that "[a] trial judge's isolated questioning to clarify ambiguities is one thing; however, a trial judge cannot assume the mantle of an advocate and take over the cross-examination for the government to merely

5

emphasize the government's proof or question the credibility of the defendant and his witnesses." United States v. Beaty, 722 F.2d 1090, 1095 (3d Cir. 1983) (quoting United States v. Singer, 710 F.2d 431, 436-37 (8th Cir. 1983) (en banc)). "Even when the evidence provides the court with a negative impression of the defendant, the judge must refrain from interjecting that perception into the trial." Godwin, supra, 272 F.3d at 678.

Where a judge engages in extensive questioning, the appellate court must apply a "balancing process" to "determine whether the trial judge's comments have pervaded the overall fairness of the proceeding." Ottaviano, supra, 738 F.3d at 596 (quoting United States v. Wilensky, 757 F.2d 594, 598 (3d. Cir. 1985)). When the judge's questioning becomes "lengthy" or "over-zealous," spanning several pages of the trial transcripts, the judge has overstepped the bounds of prudent judicial conduct. Beaty, supra, 722 F.2d at 1096.

This Court's admonition against trial-judge-overreach did not begin with Taffaro and O'Brien. It long predated those cases. Even if the expansive list of cautionary cases instructing judges on their neutral and impartial roles that foreshadowed this trial did not exist, the basic principles of fairness did. For years our judicial code of ethics was embedded with convictions of neutrality and fairness:

> [A judge] may properly intervene in a trial of a case to promote expedition, and prevent unnecessary waste of time, or to clear up some obscurity, but he should bear in mind that his undue interference, impatience, or participation in the examination of witnesses, or a severe attitude on his part toward witnesses, especially those who are excited or terrified by the unusual circumstances of a trial, may tend to prevent the proper presentation of the cause, or the ascertainment of the truth in respect thereto.
>
> [Guido, supra, 40 N.J. at 207 (quoting Canons of Judicial Ethics, Canon 15 (1924)).]

Trial judges intuitively know that they cannot buttress a party's witness, show negative emotions about the testimony of an alibi witness, or coach either party's counsel without having an impact on the jury. As Bob Dylan once wisely said, "You don't need a weatherman to know which way the wind blows." Bob Dylan, Subterranean Homesick Blues, on Bringing It All Back Home (Columbia Records 1965).

The trial court here went far beyond the purview of N.J.R.E. 614 and all guidance on the matter. The record reveals that the trial judge put his thumb on the scale, time and time again, and prejudiced defendant. The judge's actions were even more significant in a factually close case like this, where there was little physical evidence and where the State relied heavily on the credibility of seventeen witnesses at trial -- fourteen of whom faced prejudicial interrogation by the court.

II.

7

Defendant Michael Ross was charged with committing a double murder and other related offenses. The State's trial theory was that defendant mistakenly shot and killed the two victims, thinking that one of them, who had previously threatened him, had brandished a firearm. Defendant denied any involvement in the killings.

Accounts of the killings were central to the outcome of the trial, and the witnesses' testimonial credibility was crucial to the verdict. Of the seventeen witnesses presented by the State, the trial judge questioned fourteen of them -- at times interrupting the attorneys' questioning. Many of the judge's actions unequivocally strengthened the testimony of the State's law enforcement and expert witnesses. In other instances, the judge developed those same witnesses' expertise in areas that had not been developed by the prosecution or the defense. With another witness, the judge exhibited incredulity in his tone and demeanor, casting doubt upon that witness's credibility -- whose testimony was important to the defense.

Examples are numerous. The trial judge conducted a friendly examination of Officer Lyons, a State witness. The examination highlighted how Lyons was instrumental in reinvigorating this cold case and sought specific times and dates of relevant events. This effort by the judge undermined defense counsel's extensive cross-examination that challenged

8

Lyons's aggressive interrogation tactics used to elicit statements from several of the State's other witnesses. The exchange is not, as the majority has characterized it, an instance of clarification. The prejudicial effect comes after the passage quoted by the majority, when the judge rehabilitates the witness, painting him as the reviver of a cold case, and returning to mundane details far less incriminating than coercion. The tenor of the judge's exchange buttressed the detective's credibility and rehabilitated the witness after defense counsel's cross-examination.

Similarly, the court interfered with defense counsel's cross-examination of Clements, one of the State's investigators, who was present when Wakefield, a key witness for the State, gave a statement to the police explaining that defendant had admitted to the murders. Wakefield, facing charges in an unrelated case, recanted his testimony, stating that police pressured him into making the incriminating statement against defendant. Investigator Clements's testimony attempted to rebut Wakefield's claims that he had been unduly pressured during seven-and-one-half hours of questioning that included a polygraph examination. During lengthy cross-examination, defense counsel elicited testimony indicating that the polygraph examination of Wakefield actually took less time than Investigator Clements originally stated. The import of the

9

elicited testimony was that the majority of the seven-hour period was spent interrogating Wakefield, aiding Wakefield's claim (and defendant's theory) that he was pressured into making a statement against defendant.  In the midst of cross-examination, the judge called counsel to sidebar and limited defense counsel's efforts on that point.  As the Appellate Division majority conceded, that sidebar disrupted development of the timeline of Wakefield's questioning but, in context, the panel found the disruption harmless.

One of court's most profound interferences occurred during the testimony of Sharhi Roberts, a State witness.  On the stand, Roberts disavowed a statement she gave concerning a conversation she had with defendant during which defendant confessed to committing the murders.  First, the judge aided the prosecution's direct examination, then the judge demonstrated his incredulity of Roberts's testimony that was favorable to defendant.

On the heels of other intrusions, the judge interrupted the prosecutor's examination, interjecting with instructions to the prosecutor on how to probe Roberts on defendant's recantation. Apparently not satisfied with the prosecutor's examination of the State's witness, the judge gave the prosecutor detailed instructions on the questions to ask in order to elicit the necessary testimony, in the presence of the jury.  Thereafter,

10

the prosecutor resumed examination, no longer fumbling, but instead asking crisper, tighter questions.

> [PROSECUTOR]:  Okay.  Let me ask you to take a long minute and look at your statement from January 26th, 2006, and tell us on what page you indicate to the three officers and to your attorney where you state Michael Ross told me he made it up.  Take your time.
>
> [THE COURT]:  Well, you should ask her whether it was -- was it during the taped part of the conversation or during another part.
>
> [PROSECUTOR]:  Was it during the taped part of the conversation?

And again:

> [PROSECUTOR]:  And it's your testimony that your lawyer sat there and let you say when you were asked the question were there only two times, were there only two times when you discussed the murders at Avenel in Forest view and you answered or were there any other -- you were asked were there any other times, correct?  So you were asked were there any other times --
>
> [THE COURT]:  Why don't you read the exact question, Prosecutor --
>
> [PROSECUTOR]:  Thank you, Judge.
>
> [THE COURT]:  -- that's on page 18.  What page is that?
>
> [PROSECUTOR]:  Referring to page 26 --
>
> [THE COURT]:  26.
>
> [PROSECUTOR]:  -- you were asked the question were there any other times that Michael Ross asked you in reference to the shooting --
>
> [THE COURT]:  Talked to you.

11

[PROSECUTOR]:  Talked to you.

[PROSECUTOR]:  Thank you, Judge.

[THE COURT]:  Read the exact question please.

In the presence of the jury, the judge instructed the prosecutor on the manner and method of using those portions of Robert's testimony to draw out the inconsistency between her testimony at trial and her statements to the police.  While the judge found it appropriate to intervene with Roberts, he did not press with equal force the State's other two key witnesses -- McKnight or Wakefield -- signaling to the jury that Roberts's recantation was questionable, while McKnight's and Wakefield's incrimination of defendant was more credible.

Defense counsel sought to illuminate Roberts's claim that police harassed her into implicating defendant.  Yet, the judge interjected several times and suggested disbelief of her testimony:

> [DEFENSE COUNSEL]:  Can you describe for the jury the manner in which they harassed you with as much specificity as you can.
>
> [ROBERTS]: Okay.  They came to my house.  I've been evicted from places.
>
> [THE COURT]:  I'm sorry.  Came to your house and what?
>
> [ROBERTS]:  They came to my house.  Harassed me numerous times.

12

>[THE COURT]: In other words, the question is we need specifics. What did they do? Specifically, what did they do? What did they say? What did they do?
>
>[ROBERTS]: Well --
>
>[THE COURT]: Okay.
>
>[ROBERTS]: They --
>
>[THE COURT]: They came to your house. What else?

Again, the judge intervened:

>[DEFENSE COUNSEL]: Okay. So when's the first time that you can remember the police coming to you and harassing you?
>
>[ROBERTS]: The first time I remember was my father's house, on 19 Walter Drive, Woodbridge.
>
>[THE COURT]: When? When? When? When? Not where.
>
>[ROBERTS]: I can't remember the exact day.
>
>[THE COURT]: Well, was it like -- was it before August -- before October 30, 2003, or was it after October 30?
>
>[ROBERTS]: It was after.
>
>[THE COURT]: Was it a month after, a year after?

The court's questioning indicated mounting frustration with the witness:

>[THE COURT]: Was there some sort of preinterview that occurred before the recording begins?

13

> [ROBERTS]: Yes.  He stated that he wanted me --
>
> THE COURT: No.  No.  No.  Question was was there portions of the interview that was unrecorded.  Yes?

The judge exhibited more than momentary testiness.  Not only do those exchanges illustrate the judge's frustration with the witness, they show his incredulity at testimony that was favorable to defendant.  That palpable frustration does not aid the defense, as the majority suggests; instead, it telegraphs the court's skepticism of Roberts's testimony.

On several other occasions, the judge engaged in wide-ranging questioning, despite defense counsel's limited cross-examination or his decision not to cross-examine at all.  The court conducted a detailed voir dire examination of the State's forensic pathology expert, despite no cross by defense counsel.  He also questioned the State's ballistics expert, where defense counsel asked only three questions.  Despite defense counsel's decision not to cross-examine the medical examiner, the judge conducted lengthy questioning about the cause of death.  The court's questioning was far from innocuous because it opened the door for the State's experts to polish and expand their analyses, bolstering their credibility.

Defense counsel asked only a single question of Officer Ng, an investigating officer testifying for the State.  In contrast,

14

the court questioned Ng and established that defendant did not voluntarily speak with police after the October 1 incident, when a maroon Ford Taurus or Mercury Sable pulled up and blocked defendant's vehicle, in which witness McKnight was a passenger, at a traffic stop. A passenger got out of the maroon car and pointed a gun at defendant, causing defendant to hit two other cars as he sped away from the threat. The trial judge prompted the officer further, eliciting from Ng that he found defendant's identification inside a vehicle at the scene of the October 1 incident, went to defendant's house, and asked defendant's father to have defendant come to police headquarters.

That extracted testimony established that defendant did not go voluntarily to the police station after he was involved in the car accident nor did he report that he was threatened with a gun. Effectively, the court sowed the seeds of distrust of defendant, planting the inference that defendant intended to seek redress for the incident himself through illegal means. The trial judge's intrusion here had the considerable potential to negatively color the jury's view of defendant's trustworthiness and credibility.

The defense theory in this case was "mistaken identity," that is, the shooter was not defendant but McKnight -- someone whom the defense claimed many of the State's witnesses feared. In his opening statement, defense counsel indicated that

15

defendant had seen the maroon Taurus/Sable several times in the past. He also proferred that the car containing the victims was a red VW Passat. Evidence adduced at trial indicated that the passenger who originally blocked defendant and McKnight's vehicle was a black man and that the victims in the red Passat were both white men. Defense counsel also suggested that McKnight was the shooter and that he had very poor vision, 20/80, implying that McKnight could easily have mistaken the red Passat for a maroon Taurus/Sable and the white victims for black.

Counsel attempted to support his theory with the testimony of one of the State's witnesses, Huff. Huff testified that he heard "pops," went to the scene, and found the victims in the red Passat, barely alive. After defense counsel concluded cross-examination, the court questioned Huff, eliciting additional testimony about the lighting on the night of the shooting, in an apparent attempt to dispel the notion that poor-visioned McKnight was the real shooter.

> [THE COURT]: All right. And you said -- now, what did you say the lighting condition was there?
>
> [HUFF]: Dark.
>
> [THE COURT]: Dark?
>
> [HUFF]: Yes.
>
> [THE COURT]: No -- no street lights?

16

[HUFF]:  No.

[THE COURT]:  --of the apartment?

[HUFF]:  No.

Refusing to accept Huff's answer, the court made its own determination as to the lighting, and continued:

[THE COURT]:  Of course there were lights on. And what time was this around?

[HUFF]:  I couldn't even tell you, your Honor.

[THE COURT]:  Okay.  What time did you start walking?

[HUFF]:  It was dark outside?

[THE COURT]:  It was dark outside?

[HUFF]:  I guess after dinner.

[THE COURT]:  After dinner.  What time do you eat dinner usually?  Dinner.

[HUFF]:  Six-ish.

[THE COURT]:  Do you think you were walking around six?

[HUFF]:  Maybe seven, 7:30.  Digest about an hour.

[THE COURT]:  You were coming walking by that car what time do you think it was?

[HUFF]:  Well, a lot things taking place between that time.

[THE COURT]:  Any idea what time it was?

[HUFF]:  Couldn't tell you that.

[THE COURT]:  All right.  What kind of night was it?

17

>             [HUFF]:  It wasn't cold yet, but that doesn't
>     happen until the kids go trick-or-treating,
>     following day, so it was still -- still decent
>     weather.
>
>     . . . .
>
>             [THE COURT]:  Now, there was some light from --
>     wasn't there some light from the apartments
>     themselves?
>
>             [HUFF]:  From the apartments themselves up until
>     I got to this particular apartment.
>
>             [THE COURT]:  From that particular apartment
>     there wasn't many lights?
>
>             [HUFF]: Dark.  Dark.  This particular apartment.
>     Dark.
>
>             [THE COURT]:  The whole apartment was dark?
>
>             [HUFF]:  Yes.

This instance is of particular concern because the judge acted as a second prosecutor in the courtroom, apparently cross-examining a witness in order to elicit tesitmony to dispel the theory posed by defense counsel in his opening statement that the poor-visioned McKnight was the shooter who mistook the red Passat for a maroon Mercury.  When the witness insisted that it was dark and there were no lights illuminating the scene, the judge rejected the response, replying, "Of course there were lights on."  The judge did more than highlight favorable testimony for the State -- he testified on its behalf.

Here looms the deeper issue -- the court, having the benefit of hearing the defense's opening statements and theory

18

of the case, interjected, acting not only as a second prosecutor, but also as a witness. The majority admits that it is uncertain at best that the court's questioning of Huff had an adverse impact on defendant. Yet such a view minimizes the role of this Court's review in ensuring a fair trial, even under the plain-error standard. The exchange above was the culmination of many instances of improper interjection.

III.

Jurors are solicitous of judges's opinions. The judge's actions in this case indicated a favoritism toward the State and undermined the defense strategy, which is the precise course of conduct that merits a retrial. The trial judge revealed his partiality to the prosecutor's side by underscoring witness testimony, eliciting witness testimony that had not been developed, and even testifying on the State's behalf.

Significant portions of the court's questioning ran afoul of the confines of N.J.R.E. 614 -- it failed to expedite the trial, provide clarification to a witness's answer, or redress tactics of the parties. There were no rights threatened, no witnesses in distress, and the trial's only need for expedition was due to the court's continuous questioning. Very few of the instances described here can be fairly characterized as mere clarification. Instead, the trial court acted as a second prosecutor in the litigation. Especially problematic is the

19

court's intervention on multiple occasions when defense counsel chose to engage in minimal or no cross-examination. To simply dismiss the court's actions by relying on the reasoning that it is not the quantity but the quality of the questions that renders judicial intervention prejudicial flies in the face of basic notions of fairness and justice. At some point, quantity affects quality, and here, we have both an extensive collection of questions and the distinct pollution of prejudice.

The majority relies heavily on defendant's failure to object to the judge's interventions. In the normal course of the give and take of trials, motions are made and judges rule. If a party believes the ruling to be in error, that party may object. Here, defense counsel made no objection to the court's multiple intrusions. In reality, however, interposing an objection would have been no easy task given the nature of the objection in this case -- an objection to the trial judge himself.

Objecting to the court's conduct as improper and prejudicial is different in kind than the prosecutor's objection here, where at sidebar she reminded the court during the medical examiner's testimony that determining the cause of death is the province of the jury. Counsel should not be forced into the Hobbesian choice of objecting and raising the ire of the judge for the remainder of the trial, or making the strategic decision

20

of not objecting to avoid heavier interference and being seen by the jury as clearly at odds with the pillar of neutrality. Moreover, the full effects of the judge's intrusive actions were not felt until the accumulation of over thirty pages of the judge's examinations -- and, by that point, an objection or a paltry curative instruction would not unring the bell.

Prudence by the court is especially critical to ensure a fair trial when the case is close. Here, the jury was deadlocked at first and then deliberated for five days. The case was hard-fought, with a clearly viable defense that gave the jury pause. The Appellate Division majority acknowledged -- without accepting -- that the lengthy deliberations reflected that the State's evidence was not overwhelming. In such a close case, there was fertile ground upon which the judge's extensive questioning might sow mischief. The Appellate Division majority further took solace in the three-week break after the judge's last intrusions and the beginning of jury deliberations, concluding that the judge's intrusions had little impact on the fair consideration of the evidence. This is pure speculation cloaked with the patina of justification. In a criminal case this close, where a person's liberty interest is at stake, the benefit of any doubt should go to the defendant. On this point, I fully agree with the Appellate Division dissent's analysis that "when a judge sheds the mantle of impartiality, the

21

defendant's right to a fair trial is at risk."  A new trial is but a small token when considering the stakes here.

The trial court's actions were not singular.  Contrary to the restrictions set forth in our case law and rules of evidence, the judge sowed doubts as to defendant's theory of the case by buttressing the State's witnesses, casting doubt with his tone and manner on a critical defense-leaning witness, and testifying himself while adroitly avoiding examining defendant. I embrace, therefore, the plain-error standard applied by the majority, but part with them in their finding of harmless error because the trial judge's actions cumulatively had the capacity to negatively influence the jury's view of the defendant.

Where the majority finds that the judge came perilously close to the line, I find that he clearly crossed it, denying the defendant his due process right to a fair trial.

I find plain error and I dissent.