**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court."
Although it is posted on the internet, this opinion is binding only on the
parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-0818-15T4

STATE OF NEW JERSEY,

    Plaintiff-Respondent,

v.

HARRY J. NEHER, a/k/a JOHN NEHER,

    Defendant-Appellant.

_____

Submitted December 4, 2017 — Decided  June 7, 2018

Before Judges Messano and Vernoia.

On appeal from Superior Court of New Jersey,
Law Division, Gloucester County, Indictment
No. 13-09-0902.

Joseph E. Krakora, Public Defender, attorney
for appellant (Jay L. Wilensky, Assistant
Deputy Public Defender, of counsel and on the
briefs).

Charles A. Fiore, Acting Gloucester County
Prosecutor, attorney for respondent (Douglas
B. Pagenkopf, Special Deputy Attorney General/
Acting Assistant Prosecutor, on the brief).

Appellant filed a pro se supplemental brief.

PER CURIAM

Defendant Harry J. Neher appeals his convictions following a jury trial and aggregate forty-year sentence for first-degree murder, tampering with evidence, hindering apprehension and weapons offenses. Based on our review of the evidence in light of the applicable law, we affirm defendant's convictions, vacate his sentence and remand for resentencing.

I.

On December 31, 2012, Sabrina Bullock's lifeless body was discovered in a storage shed behind defendant's apartment building in Woodbury. Bullock was found with a computer keyboard cord tied around her neck, and it was later determined she died as a result of blunt force head and neck trauma.

Defendant, a self-employed electronics technician, was subsequently arrested and charged in an indictment with the following offenses: knowing or purposeful murder, N.J.S.A. 2C:11-3(a)(1) (count one); possession of a weapon for an unlawful purpose, N.J.S.A. 2C:39-4(d) (count two); tampering with evidence, N.J.S.A. 2C:28-6(1) (count three); hindering apprehension, N.J.S.A. 2C:29-3(b)(1) (count four); and unlawful possession of a weapon, N.J.S.A. 2C:39-5(d) (count five).

The evidence presented at defendant's trial showed that on December 30, 2012, Bullock was reported missing by her mother, Maggie Bullock, who last spoke with Bullock at around 5:30 p.m.

the previous day. Maggie Bullock went to defendant's apartment to look for her daughter because she had previously seen Bullock and defendant together. Later in the day, Maggie Bullock spoke with defendant on the phone and defendant asked, "[W]hat do you think, I killed [Bullock]?"

Defendant and his then-girlfriend Kelly Gall lived in an apartment building on Broad Street in Woodbury and often bought drugs from Bullock. Based on information received from Bullock's mother, on December 30, 2012, Woodbury Patrolman Andrew DiGiambattista went to defendant's apartment seeking information concerning Bullock's whereabouts. Defendant said he had seen Bullock the previous evening at "[a]pproximately [eight] p.m.," and spoke with Bullock about assisting her with her laptop computer.

Police used information obtained from Bullock's cell phone carrier to trace Bullock's phone to the parking lot behind defendant's apartment. On December 31, 2012, DiGiambattista investigated the parking lot, and found Bullock's body inside a storage shed. She "appeared to have full rigor mortis and . . . was cold to the touch." DiGiambattista also observed "a [keyboard] cord wrapped around her neck."

During DiGiambattista's trial testimony, he identified photographs depicting the shed as he observed it on December 31,

3

2012. Following an objection by defense counsel, DiGiambattista acknowledged he did not take the photographs. In response to questions posed by the court, however, he testified he was present when some of the photographs were taken and that all of the photographs accurately depicted the scene in the shed as he observed it.

Detective Nicholas Schock took the photographs and also testified they accurately depicted the scene in the shed. He identified photographs showing "footwear impressions that [were] made in blood" around the victim and "a keyboard that was found underneath [Bullock] with the cord" wrapped around her neck. Schock also took photographs of defendant's apartment, tested areas of the bathroom he believed might contain suspected blood and swabbed a blood sample from the bathroom sink. A crime scene investigator testified he removed a section from the shed's floor that appeared to contain evidence of "footwear impressions."

The evidence also showed two trash bags containing clothing were recovered during the investigation: one from a dumpster behind defendant's apartment, and another from a trash corral located near the apartment. The bag recovered from the dumpster contained a black hooded jacket, a ski mask, a pair of sneakers, blue knit gloves, a green hooded sweatshirt and a black Airwalk T-shirt. Schock testified the sneakers were a men's size ten and a half,

and had a distinctive "jagged" tread sole pattern. The bag recovered from the trash corral contained household garbage, a pill bottle prescribed to Gall, and two pairs of sweatpants, one of which contained areas with suspected blood.

The State presented evidence showing comparisons between defendant's DNA, Bullock's DNA, and DNA obtained from the clothing found in the bags recovered from the dumpster and trash corral. Bullock's DNA was obtained through the use of a sexual assault evidence collection kit, which in part included the taking of a blood sample from Bullock's body.

An expert in forensic serology and biological stain analysis testified that blood was recovered and tested from one of the sneakers, and the sweatshirt and jacket recovered from the bag found in the trash corral. An expert in DNA testing analysis testified that the DNA found on the sweatshirt contained a mixed DNA profile, with Bullock as the major contributor and defendant as the minor contributor. The expert further explained that the DNA found on a second sweatshirt sample also contained a mixed profile, and that defendant's DNA was the source of the major DNA profile found.

The expert also determined that one of the DNA samples from the jacket showed a mixed DNA profile, with the victim as the major contributor and defendant as the minor contributor. The

expert explained that the second DNA sample from the jacket revealed three contributors, with defendant as the source of the major DNA profile.

An expert in footwear impression analysis testified that she conducted test impressions of the sneakers recovered from the bag found in the dumpster, and compared them to the impressions developed from the shed's flooring. Defendant objected to the expert's testimony concerning photographs of the impressions used during the analysis because the expert had not taken the photographs. The court questioned the expert, and she explained that the photographs accurately depicted the impressions and the flooring. Defendant's counsel indicated he was satisfied, and there was no further objection to the testimony.

The expert opined that eight of the twenty-two impressions from the shed's floor shared a similar "chevron" or "zig[-]zag" pattern as the soles of the recovered sneakers. She testified that eight of the other impressions did not include sufficient characteristics to provide a basis for comparison, and acknowledged the possibility that other impressions did not come from the recovered sneakers.

The State presented testimony from an expert in forensic pathology that Bullock suffered a "half inch fracture in the right side and . . . a quarter inch fracture in the left side of the

neck." Bullock also suffered from "compression of the neck or blunt trauma to the neck" which indicated her neck "was either squeezed" or there was a blow to her neck causing a hemorrhage. The expert testified Bullock "died of blunt head and neck trauma that caused bleeding around the membranes of the brain and bleeding within the brain. Additionally there was hemorrhage in the neck organs indicating blunt neck trauma with possible compression."

Defendant testified at trial that he knew Bullock because he bought drugs from her. He explained she came to his apartment during the morning hours of December 29, 2012, and later he fought with Gall because she believed he was "cheating on her" with Bullock. He testified that during the day, Gall called Bullock and argued with her over the phone.

Defendant testified he called Bullock at around 7:40 p.m. to see if he could buy marijuana, and Bullock came to the apartment a short time later. According to defendant, he and Bullock left the apartment and went outside to smoke marijuana. He returned to the apartment alone to obtain a cellphone for Bullock and while he looked around the apartment, he saw Gall in the bathroom wearing an "Airwalk t-shirt" washing blood off her hands. He saw blood on Gall's forehead, and when he told her he was going outside to meet Bullock, Gall pushed him causing him to injure his thumb.

Defendant explained that he prepared to leave the apartment, put on his jacket and noticed blood on his hand. He said he asked Gall to see her hands but did not see any cuts, and that is when he "found out that it was [Bullock's] blood and that [Gall] had attacked [Bullock]." Defendant did not explain what caused him to reach that conclusion.

Defendant denied killing Bullock, but admitted taking clothes Gall placed into the plastic bag and putting the bag in the trash corral. He admitted the sneakers had been given to him by Gall, but said he did not wear them because they were too small. He denied wearing the jacket and sweatshirt found in the bag on the day of the murder. He admitted he disposed of the bag in the trash corral, and Gall cleaned their apartment.

Defendant testified that Gall placed the other bag in the dumpster. He admitted the bag contained clothes that he wore on the day Bullock was murdered. He testified he found out Bullock was murdered on December 31, 2012, but also stated that on December 30, 2012, he knew Bullock was in the shed. On cross-examination, defendant "admit[ed] that [he] tried to cover up a crime, but . . . didn't commit the murder."

Gall testified as a rebuttal witness for the State. She explained that she knew Bullock because she and defendant bought drugs from her. Gall denied believing defendant was cheating on

8

her with Bullock, and testified she knew defendant went to Bullock's house on occasion to fix her computer. Gall said that on the evening of December 29, 2012, defendant returned to their apartment and asked for assistance because he "got jumped." She saw defendant take off his clothes and put them in a plastic bag. He then said he was going to the hospital and left the apartment with the plastic bag. Gall denied any involvement in Bullock's murder.

The jury found defendant guilty on each of the charges in the indictment. At defendant's sentencing proceeding, the court imposed a forty-year sentence with "a parole ineligibility period of [thirty] years," for defendant's first-degree murder conviction. The court merged defendant's conviction for tampering with evidence with his conviction for hindering apprehension, and sentenced defendant to a term of eighteen months on those charges. The court also merged defendant's convictions for the two weapons offenses, and sentenced defendant to eighteen months. The court ordered that the sentences be served concurrently.

At a subsequent resentencing hearing, the court explained that it erred in its imposition of the parole ineligibility period for the sentence on the murder conviction. The court stated that the sentence imposed for the murder conviction was subject to the No Early Release Act (NERA), N.J.S.A. 2C:43-7.2, and therefore

modified that sentence to include an eighty-five percent period of parole ineligibility and a five-year period of parole supervision as required under NERA.

Defendant appealed from the judgment of conviction and presents the following arguments for our consideration:

POINT I

THE TRIAL COURT ERRED PREJUDICIALLY IN ADMITTING EVIDENCE OF A RAPE KIT TAKEN OF THE VICTIM IN THE ABSENCE OF ANY EVIDENCE OR ALLEGATION OF SEXUAL ASSAULT.

POINT II

THE PROSECUTOR COMMITTED PREJUDICIAL MISCONDUCT, NECESSITATING REVERSAL, [U.S. Const. amend. XIV]; [N.J. Const. art. I, ¶¶ 9, 10]. (NOT RAISED BELOW)

    A. State's Opening Statement

        1. The Opening Constituted a Repeated Declaration of Guilt.

        2. The Opening Was Overly Inflammatory.

        3. The Opening Was Improperly Argumentative.

    B. State's Summation

    C. These Improprieties Constituted Plain Error.

POINT III

THE TRIAL COURT ENGAGED IN EXCESSIVE QUESTIONING OF WITNESSES, TO THE DEFENDANT'S

10

PREJUDICE. [U.S. Const. amend. XIV]; [N.J. Const. art. I, ¶¶ 9, 10]. (NOT RAISED BELOW).

POINT IV

THE TRIAL COURT IMPOSED AN EXCESSIVE SENTENCE, NECESSITATING REDUCTION.

In a supplemental pro-se brief, defendant further argues:

POINT I

THE PROSECUTOR COMMITTED PREJUDICIAL MISCONDUCT, NECESSITATING REVERSAL. [U.S. Const. amend. XIV]; [N.J. Const. art. I, ¶¶ 9, 10].

POINT II

THE TRIAL COURT ERRED WHILE DELIVERING INSTRUCTIONS TO THE JURY.

POINT III

THE CUMULATION OF CERTAIN ERRORS DEPRIVED DEFENDANT OF A FAIR TRIAL.

II.

A.

Defendant first argues the court erred by allowing testimony that a sexual assault evidence collection kit was utilized to collect evidence from Bullock's body, and that the results of the testing did not reveal any evidence of a sexual assault.[1] Defendant argues the testimony was irrelevant because there was

---

[1] Defendant does not argue that the evidence obtained from the use of the kit, such as Bullock's blood sample and resulting DNA profile, was improperly admitted into evidence.

no allegation or evidence Bullock was the victim of a sexual assault, and highly prejudicial because it unnecessarily introduced the specter of sexual assault into the case, producing revulsion toward defendant and sympathy for Bullock. We are not persuaded.

"[C]onsiderable latitude is afforded a trial court in determining whether to admit evidence, and that determination will be reversed only if it constitutes an abuse of discretion." State v. Kuropchak, 221 N.J. 368, 385 (2015) (citation omitted). "In light of the broad discretion afforded to trial judges, an appellate court evaluates a trial court's evidentiary determinations with substantial deference." State v. Cole, 229 N.J. 430, 449 (2017). "Under that standard, an appellate court should not substitute its own judgment for that of the trial court, unless 'the trial court's ruling was so wide of the mark that a manifest denial of justice resulted.'" Kuropchak, 221 N.J. at 385 (citations omitted). We apply those standards here.

"The fundamental principle guiding the admission of evidence is relevance." State v. Weaver, 219 N.J. 131, 149 (2014). Evidence is relevant if it has "a tendency in reason to prove or disprove any fact of consequence to the determination of the action." N.J.R.E. 401. Nevertheless, even "relevant evidence may be excluded if its probative value is substantially outweighed by

the risk of (a) undue prejudice, confusion of issues, or misleading the jury or (b) undue delay, waste of time, or needless presentation of cumulative evidence."  N.J.R.E. 403.

We find no abuse of discretion in the court's admission of the experts' testimony about the use of the sexual assault kit and the results of their findings from the kit, including the absence of sperm or any other indicia of a sexual assault.  The testimony established facts of consequence: law enforcement's comprehensive investigation of the potential circumstances surrounding Bullock's murder and the processes used to obtain the DNA evidence that inculpated defendant.  Defendant and Bullock's mixed DNA profiles in the blood found on the clothing directly linked defendant to Bullock's murder.  Bullock's DNA was obtained from the use of the sexual assault kit.

Defendant argues the witnesses' reference to a "sexual assault kit" and the evidence showing Bullock was tested for physical evidence of sexual assault was unnecessary, unduly prejudicial and diverted the jury's attention by introducing sexual assault into the case.  The record does not support this contention.  There was no allegation of sexual assault, defendant was not charged with sexual assault and the testimony established there was no evidence of a sexual assault.  The only evidence obtained from the use of the kit was Bullock's blood and the

resulting DNA profiles. Indeed, on cross-examination of one of the State's experts, defense counsel ably obtained an unequivocal admission that the use of the kit yielded no evidence of a sexual assault. Defendant makes no showing that the testimony confused the jury or diverted its attention from the charges in the indictment. We therefore find no basis to depart from the "substantial deference" we pay "to the trial court's 'highly discretionary determination.'" State v. Cook, 179 N.J. 533, 568 (2004).

Moreover, even if it was error to permit the experts to refer to the "sexual assault kit," the error was harmless. R. 2:10-2. The evidence showing defendant's guilt was overwhelming, and based on our review of the record, we are convinced that admission of the testimony, even if error, was not clearly capable of producing an unjust result. R. 2:10-2; State v. R.B., 183 N.J. 308, 328 (2005).

B.

Defendant next argues a reversal is required because the prosecutor engaged in misconduct in his opening and closing arguments. More specifically, defendant claims that during the prosecutor's opening statement, he repeatedly declared defendant's guilt, used inflammatory language to attack defendant and create sympathy for Bullock and was improperly argumentative. Defendant

14

further contends that during summation, the prosecutor denigrated defendant, expressed impermissible personal opinions about defendant's credibility and the evidence and made misstatements about the evidentiary record.

"A prosecutor must 'conscientiously and ethically undertak[e] the difficult task of maintaining the precarious balance between promoting justice and achieving a conviction,' ensuring that at all times his or her 'remarks and actions [are] consistent with his or her duty to ensure that justice is achieved.'" State v. Jackson, 211 N.J. 394, 408 (2012) (alterations in original) (quoting State v. Williams, 113 N.J. 393, 447-48 (1988)).

"Notwithstanding the high standard to which a prosecutor is held as he or she gives an opening statement or summation, 'not every deviation from the legal prescriptions governing prosecutorial conduct' requires reversal." Id. at 408-09 (quoting Williams, 113 N.J. at 452). "Prosecutorial misconduct is a basis for reversal of a criminal conviction if the conduct was so egregious that it deprived the defendant of the right to a fair trial." State v. Gorthy, 226 N.J. 516, 540 (2016) (quoting State v. Josephs, 174 N.J. 44, 124 (2002)).

In reviewing a claim of prosecutorial misconduct, a reviewing court considers: "whether 'timely and proper objections' were raised; whether the offending remarks 'were withdrawn promptly';

A-0818-15T4

. . . whether the trial court struck the remarks and provided appropriate instructions to the jury . . . [and] whether the offending remarks were prompted by comments in the summation of defense counsel." State v. Smith, 212 N.J. 365, 403-04 (2012) (citations omitted).

> Generally, if no objection was made to the improper remarks, the remarks will not be deemed prejudicial. Failure to make a timely objection indicates that defense counsel did not believe the remarks were prejudicial at the time they were made. Failure to object also deprives the court of the opportunity to take curative action.
>
> [State v. Timmendequas, 161 N.J. 515, 576 (1999) (citations omitted).]

Measured against these standards, we find no basis to reverse defendant's convictions based on the prosecutor's alleged improper statements.

Defendant argues the following comments in the prosecutor's opening constituted impermissible statements about defendant's guilt:

> Who you will not see in this courtroom is [] Bullock. She will not be here to tell you what happened on December 29, 2012. And I get to introduce to you her, who [] Bullock was before this man right here got to her.
>
> . . . .
>
> Ladies and gentlemen, let me reintroduce you to the person who did this. This killer right there, take a look at him.

. . . .

> [T]he police in this case did locate that evidence he attempted to discard, and it was found.
>
> And but for that being found he possibly could have gotten away with murder.
>
> . . . .
>
> Ladies and gentlemen, this man's a killer, right here.  He is a murderer, and the State intends to prove that.

A prosecutor has great leeway in his or her opening comments. See id. at 692.  Our review of a prosecutor's opening statement "is two-fold: whether the prosecutor committed misconduct, and, if so, 'whether the prosecutor's conduct constitutes grounds for a new trial.'"  State v. Wakefield, 190 N.J. 397, 446 (1994) (quoting State v. Smith, 167 N.J. 158, 181 (2001)).  In order to satisfy the second prong of that test, a prosecutor's misconduct "must have been 'so egregious that it deprived defendant of a fair trial.'"  Ibid.  To warrant a new trial, the prosecutor's comments "must have substantially prejudiced defendant's fundamental right to have a jury fairly evaluate the merits of his defense."  Ibid.

We reject defendant's contention that the prosecutor's statements were impermissible or require a reversal.  Defendant relies on select statements but fails to properly consider them in their context.  The prosecutor made each statement as part of

17

a broader and permissible message that the State intended to prove defendant was a murderer, and not that the prosecutor was declaring defendant as such.

For example, after calling defendant the "killer right there," the prosecutor stated: "Now you may be wondering . . . [w]hat proof do you have?" and explained in detail the evidence the State would present to establish defendant killed Bullock. The prosecutor's explanation of how he intended to prove defendant was the killer is not only within the bounds of permissible conduct, but is also what an opening statement is intended to be. See State v. Walden, 370 N.J. Super. 549, 558 (App. Div. 2004) ("A prosecutor's opening statement should provide an outline or roadmap of the State's case. It should be limited to a general recital of what the State expects, in good faith, to prove by competent evidence." (quoting State v. Torres, 328 N.J. Super. 77, 95 (App. Div. 2000))).

At all times during his opening statement, the prosecutor reminded the jury of what he intended to prove, using phrases such as "You'll be able to see," "You'll hear from those individuals," and "the State [] expects to present to you," certain types of evidence. The prosecutor also made clear that the State "must prove" defendant murdered the victim beyond a reasonable doubt, and that "it intend[ed] to prove that." Thus, when considered in

18

context, we discern no intention by the prosecutor to declare defendant's guilt.

Moreover, defendant did not object to any of the prosecutor's declarations during the opening statement. To the contrary, defense counsel began his opening statement by properly reminding the jury that, in accordance with the court's preliminary instructions, "what is said in an opening statement is not evidence," and that "[a]nything [the prosecutor] just said [is not] evidence."

Defendant's reliance on State v. Rivera, 437 N.J. Super. 434 (App. Div. 2014), is misplaced. In Rivera, the prosecutor explicitly declared the defendant's guilt by using a PowerPoint presentation in his opening statement that showed "a photograph [of the] defendant's face and neck, which [was] displayed with a bright red border." Id. at 447. "It also include[d] text, printed in the same color and density, 'Defendant GUILTY OF: ATTEMPTED MURDER.' The words 'Defendant' and 'GUILTY OF:' appear[ed] on separate lines to the right of [the] defendant's photograph, and 'ATTEMPTED MURDER' appear[ed] below the photograph in much larger typeface." Ibid.

The prosecutor in Rivera explicitly declared the defendant's guilt by listing the words "guilty of" next to "attempted murder." Ibid. In reversing the defendant's convictions, we recognized

19

that "[o]ur Supreme Court "has consistently condemned conduct that invades the exclusive province of the jury to resolve factual disputes, assess credibility and decide whether the State's evidence establishes guilt." Id. at 449 (citations omitted). We found "[i]t is difficult to conclude that a prosecutor's declaration of the defendant's guilt before the first witness is sworn would not have invaded the province of the jurors." Id. at 450.[2]

Here, the prosecutor's comments do not rise to the same level or degree as those employed by the prosecutor in Rivera. There was no declaration of defendant's guilt, and the prosecutor's comments were accompanied by an acknowledgment that the State had the burden of proving the elements of the offenses charged and a description of the evidence which the prosecutor intended to introduce to satisfy that burden. See State v. Hipplewith, 33 N.J. 300, 311 (1960) (explaining it is improper for a prosecutor

---

[2] Our decision in Rivera did not turn exclusively on the prosecution's use of the PowerPoint presentation during its opening. The prosecutor also used the PowerPoint presentation in summations and "included statements about the law of self-defense that were so oversimplified as to be misleading." Id. at 463. Thus, we were also concerned with the jury's "capacity to follow [the trial judge's] instructions." Id. at 464 (citations omitted). We reversed based on the "cumulative impact of the prosecutor's misconduct." Id. at 465.

to state, explicitly or implicitly, his or her personal belief of a defendant's guilt unless it is based on the evidence).

Moreover, even if the prosecutor's statements were improper, they did not deprive defendant of a fair trial, Wakefield, 190 N.J. at 467, and the lack of any objection to the statements may be properly viewed as an acknowledgement they were not prejudicial, See State v. Frost, 158 N.J. 76, 83 (1999) (holding generally, "remarks will not be deemed prejudicial" if no objection was made at trial); see also State v. Abdullah, 372 N.J. Super. 252, 267-68 (App. Div. 2004) ("Where, as here, the defendant's lawyer fails to object at trial, we may legitimately infer that counsel did not consider the remarks inappropriate or prejudicial."), aff'd in part, rev'd in part on other grounds, 184 N.J. 497 (2005).

We also reject defendant's assertion that the prosecutor's opening statement was overly inflammatory based on his description of how Bullock appeared when her body was found:

> The [] Bullock that you'll see? She's bloody, beaten, swollen, with her lifeless body propped on a keyboard with its cord wrapped around her neck . . . .
>
> [The State] took photographs of [defendant's] hands . . . .
>
> I'm going to leave those pictures for you to judge. You can evaluate them. You can evaluate if they are bruises on his hands and if it's consistent with being involved in this brutal, vicious murder of [] Bullock.

"A prosecutor may summarize the State's case graphically and forcefully." State v. W.L., 292 N.J. Super. 100, 110 (1996). At the same time, however, a prosecutor "may not make 'inflammatory and highly emotional' appeals which have the capacity to defer the jury from a fair consideration of the evidence of guilt." Id. at 111 (quoting State v. Marshall, 123 N.J. 1, 161 (1991)).

We have not hesitated to criticize rhetorical excesses by prosecutors that invite juror sympathy for the victim. See, e.g., State v. Roman, 382 N.J. Super. 44, 58-59 (App. Div. 2005) (criticizing prosecutor's remarks that it was the duty of adults, including the jurors, to protect the child victim); State v. Buscham, 360 N.J. Super. 346, 364-65 (App. Div. 2003) (same); State v. Hawk, 327 N.J. Super. 276, 282 (App. Div. 2000) (suggestions that the jury "send a message" through its verdict, "were inappropriate, inflammatory and constitute[d] misconduct"). Contrary to defendant's claim, however, the prosecutor's comments were not "calculated to arouse sympathy for the victim and hate and anger against the defendant," like the comments we determined required a reversal in W.L., 292 N.J. Super. at 111. In W.L., the prosecutor commented on the innocence of all children generally, the effects of the crime on the victim's family, and advised the jury that if it found the State has proven

its case it had a "strong duty to find him guilty." Id. at 105-09.

Here, the prosecutor provided nothing more than a brief and accurate description of Bullock's body as it appeared when it was discovered, coupled with a preview of the evidence that would be presented to establish the body's condition. The prosecutor's description was graphic, but there was no objection, and the description was neither impermissible, see W.L., 292 N.J. Super. at 110-11, nor capable of depriving defendant of a fair trial, see Wakefield, 190 N.J. at 443.

We similarly reject defendant's contention that the prosecutor's opening statement was unduly argumentative. We find no support in the record for defendant's reliance on State v. Spano, 64 N.J. 566, 567 (1974), where the Court reversed a defendant's conviction because the prosecutor interrupted defense counsel's opening statement and declared the defendant had an opportunity to appear before the grand jury and testify, but did not do so. The Court determined the prosecutor's comment constituted a declaration that the defendant would have testified if he was innocent, but was guilty because he did not. Id. at 567-68. The prosecutor made no comparable remarks here.

C.

Defendant further contends the prosecutor committed prosecutorial misconduct by misstating facts in support of his argument defendant was not credible and by stating defendant was a liar. Although we agree the prosecutor's comments were improper, we are not convinced they were sufficiently prejudicial to have deprived defendant of a fair trial.

We consider the propriety of a prosecutor's comments during summation under a standard similar to that applied in our consideration of comments made during opening statements. A prosecutor is "entitled to wide latitude in his [or her] summation . . . [s]o long as he [or she] stays within the evidence and the legitimate inferences therefrom." R.B., 183 N.J. at 330 (quoting State v. Mayberry, 52 N.J. 413, 437 (1968)).

In our determination of the propriety of a prosecutor's summation, we consider "whether 'timely and proper objections' were raised; whether the offending remarks 'were withdrawn promptly'; and whether the trial court struck the remarks and provided appropriate instructions to the jury." Smith, 212 N.J. at 403 (internal citation omitted) (quoting Frost, 158 N.J. at 83). If prosecutorial misconduct occurred and the comments "were sufficiently egregious, a new trial is appropriate, even in the

face of overwhelming evidence" of a defendant's guilt.  Id. at 404.

"Whether particular prosecutorial efforts can be tolerated as vigorous advocacy or must be condemned as misconduct is often a difficult determination to make.  In every instance, the performance must be evaluated in the context of the entire trial, the issues presented, and the general approaches employed." State v. Negron, 355 N.J. Super. 556, 576 (App. Div. 2002).  "To justify reversal, the prosecutor's conduct must have been clearly and unmistakably improper, and must have substantially prejudiced [the] defendant's fundamental right to have a jury fairly evaluate the merits of his [or her] defense."  State v. Nelson, 173 N.J. 417, 460 (2002) (alterations in original) (quoting State v. Papasavvas, 163 N.J. 565, 625 (2000)).

Defendant argues he was improperly denigrated by the prosecutor's comments concerning defendant's statements to Bullock's mother when she asked if he had seen Bullock after Bullock went missing.  The prosecutor told the jury:

> [W]hat type of ruthless individual will look
> a mother who's looking for her daughter in the
> eye when he knows, he knows she's dead.  He
> knows she's dead and he didn't tell her.  He
> knows it.
>
> And not only did he not tell her, Taylor
> Bullock was there too, her poor daughter.  He
> looked her in the eye too.  They're looking

for [the victim] . . . and he knows. Ladies and gentlemen, that is not a character trait of someone who just covers a crime up. That is a character trait of a murderer. That is a character trait of someone who kills a wom[a]n and tries to take another one down while doing it. That's what he is.

We have criticized a prosecutor's use of derogatory statements about a defendant, see, e.g., Wakefield, 190 N.J. at 467; State v. Pennington, 119 N.J. 547, 576-77 (1990), and the prosecutor's references to defendant as "ruthless" and having a "character trait of a murderer" were improper comments having no place in defendant's trial. However, we must evaluate the challenged remarks in the context of the "summation as a whole." State v. Atwater, 400 N.J. Super. 319, 335 (App. Div. 2008) (citation omitted).

Here, the prosecutor's comments were fleeting, and made during a summation that otherwise detailed the substantial evidence supporting the determination of defendant's guilt. "Generally, . . . a 'fleeting and isolated' remark is not grounds for reversal." Gorthy, 226 N.J. at 540 (quoting State v. Watson, 224 N.J. Super. 354, 362 (App. Div. 1988)). Moreover, "[w]hen, as here, the defendant does not object to the prosecutor's statement, that statement does not warrant reversal of the conviction unless it is 'of such a nature as to have been clearly capable of producing an unjust result.'" Ibid. (quoting R. 2:10-

26

2); accord State v. Echols, 199 N.J. 344, 360 (2009). We are therefore satisfied that the improper comments did not "substantially prejudice[] . . . defendant's fundamental right to have a jury fairly evaluate the merits of his . . . defense." State v. Ingram, 196 N.J. 23, 43 (2008).

We have carefully considered defendant's remaining contentions, including those asserted in defendant's pro se supplemental brief, and find they are without sufficient merit to warrant discussion in a written opinion. R. 2:11-3(e)(2). We add only that the prosecutor's assertions of fact during summation, when considered in context, were either directly supported by the evidence or constituted inferences reasonably drawn from the evidence. In addition, the court instructed the jurors that they were "the sole exclusive judges of the evidence, of the credibility of the witnesses, and the weight to be attached to the testimony of each witness . . . regardless of what counsel said or may have said recalling the evidence in this case." We presume the jury followed the court's instructions, Smith, 212 N.J. at 409, and therefore accorded no weight to any purported misstatement of fact in the prosecutor's summation. The challenged statements otherwise did not deprive defendant of a fair trial.

D.

Defendant further contends the court erred by engaging in what he characterizes as excessive questioning of DiGiambattista and the State's footwear impressions expert. During DiGiambattista's testimony, the court asked questions about whether the photographs he was shown accurately depicted the scene in the shed and Bullock's body when he found her. The court similarly asked the expert questions about whether photographs that she did not take accurately depicted the footwear impressions found on the shed's flooring. Defendant argues the questioning constituted unwarranted judicial intervention and violated his right to a fair trial. We disagree.

Defendant did not object to the court's questioning of the witnesses. We therefore review for plain error, and "disregard any alleged error 'unless it is of such a nature as to have been clearly capable of producing an unjust result.'" State v. Funderburg, 225 N.J. 66, 79 (2016) (quoting R. 2:10-2). We find no plain error here.

In State v. Ross, 229 N.J. 389, 408-09 (2017), the Court recently summarized the relevant legal standard:

> The New Jersey Rules of Evidence explicitly permit trial judges to interrogate witnesses. Judges are authorized to question witnesses "in accordance with law and subject to the

28

right of a party to make timely objection." N.J.R.E. 614.

Indeed, we have recognized that the discretionary power of a judge to participate in the development of proof is of "high value." [State v. Guido, 40 N.J. 191, 207 (1963)]. A trial judge may intervene to expedite the proceedings and clarify testimony. [State v. O'Brien, 200 N.J. 520, 534 (2009)]. A trial judge may also pose questions to help elicit facts from a witness who is in severe distress. [State v. Taffaro, 195 N.J. 442, 451 (2008)].

Although a trial judge has wide latitude to question witnesses, a judge must exercise this authority with "great restraint," especially during a jury trial. Ibid. A judge must use considerable care when questioning witnesses to avoid influencing the jury. Ibid. There is a grave risk that a trial court may influence a jury through its questioning by signaling doubt about a witness's credibility or suggesting that it favors one side over the other. See O'Brien, 200 N.J. at 523 (noting that [a] judge "holds powerful symbolic position vis-a-vis jurors . . . and must refrain from any action that would suggest that he favors one side over the other, or has a view regarding the credibility of a party or a witness"). A fine line separates proper and improper judicial questioning. A trial court crosses this line when its inquiries give the jury an impression that it takes one party's side or that it believes one version of an event and not another. See Taffaro, 195 N.J. at 451.

In determining whether a trial judge crossed over this line, we must examine the record as a whole. See id. at 454. "[I]t is the impact of the court's questions, and not the number of minutes they lasted, which matters most." Ibid.

29

Measured against that standard, we are satisfied the court did not abuse its discretion by questioning the witnesses about the accuracy of the photographs.  The court's questions were limited to the witnesses' knowledge concerning the photographs, and could neither be reasonably interpreted as favoring one side of the case nor as expressing an opinion on the credibility of either side's version of the events.  Cf. O'Brien, 200 N.J. at 537 (reversing conviction based on judge's questioning of a witness "le[ft] the impression that [the judge] did not believe [the] defendant's claim").  The record simply does not support or permit a conclusion that the court's questioning was capable of producing an unjust result.  R. 2:10-2.

### E.

Defendant challenges his sentence, claiming the court erred by imposing an excessive sentence based upon its application of aggravating factors one, "[t]he nature and circumstances of the offense, and the role of the actor therein, including whether or not it was committed in an especially heinous, cruel, or depraved manner," N.J.S.A. 2C:44-1(a)(1); three, the risk defendant will commit another offense, N.J.S.A. 2C:44-1(a)(3); six, the extent and seriousness of defendant's prior record, N.J.S.A. 2C:44-1(a)(6); and nine, the need to deter defendant and others from violating the law, N.J.S.A. 2C:44-1(a)(9).

30

"Appellate review of sentencing is deferential, and appellate courts are cautioned not to substitute their judgment for those of our sentencing courts." State v. Case, 220 N.J. 49, 65 (2014) (citation omitted). Thus, disturbing a sentence is permissible in "only three situations: (1) the trial court failed to follow the sentencing guidelines, (2) the aggravating and mitigating factors found by the trial court are not supported by the record, or (3) application of the guidelines renders a specific sentence clearly unreasonable." State v. Carey, 168 N.J. 413, 430 (2001).

Our Supreme Court has cautioned that a reviewing court should not second-guess a trial court's diligent exercise of its sentencing discretion that is in accordance with the sentencing guidelines. State v. Cassady, 198 N.J. 165, 180-81 (2009); State v. Roth, 95 N.J. 334, 365 (1984). Rather, appellate courts must abide by a sentence imposed in accordance with the sentencing guidelines unless it "shocks the judicial conscience." Cassady, 198 N.J. at 180; see also State v. Tindell, 417 N.J. Super. 530, 570 (App. Div. 2011). We are "empowered — indeed obligated — to correct a clearly unreasonable sentence, even if the judge applied correctly the statutory sentencing guidelines." Tindell, 417 N.J. Super. at 571.

A trial court must not only make findings of aggravating and mitigating factors, but must also weigh and balance the factors

in a process that requires more than a quantitative comparison of "the number of pertinent aggravating factors with the number of applicable mitigating factors." State v. Fuentes, 217 N.J. 57, 72 (2014). The sentencing court must "qualitatively assess[] and assign[] appropriate weight in a case-specific balancing process." Id. at 72-73. "When the aggravating and mitigating factors are identified, supported by competent, credible evidence in the record, and properly balanced," an appellate court must affirm the sentence provided it does not shock our judicial conscience. Case, 220 N.J. at 65. If the sentencing court "forgoes a qualitative analysis" of the aggravating and mitigating factors "or provides little 'insight into the sentencing decision,' then the deferential standard of appellate review of a sentence does not apply. Ibid.

In a sentencing court's application of aggravating factors, "sentencing courts are cautioned to avoid 'double counting' circumstances that the Legislature has already incorporated as an element of the offense." State v. Lawless, 214 N.J. 594, 608 (2013). Thus, relying on factors that support an element of a crime, such as the victim's death which underlies the murder offense, may not be used as aggravating factors for sentencing of that particular crime. Ibid.

Here, defendant argues the court engaged in impermissible double counting by finding aggravating factor one based on the injuries resulting in Bullock's death. The court gave substantial weight to aggravating factor one, and found the factor because Bullock "died of blunt head and neck trauma" that "caused bleeding around the membrane of the brain and bleeding within the brain," as well as "hemorrhage within the neck organs indicating blunt neck trauma with possible compression." The court also noted that a "cord was used" that was "wrapped around her neck."

Where the defendant is charged with a purposeful and knowing murder, "the sentencing court's application of aggravating factor one must be based on factors other than the death of the victim and the circumstances essential to support a finding" that the defendant knowingly and purposely caused the victim's death. Fuentes, 217 N.J. at 76. The sentencing court must engage in a "nuanced analysis of the defendant's offense," and provide a clear explanation to permit an appellate court to determine if the elements of offense have been double counted. Ibid. "[A] sentencing court may justify the application of aggravating factor one, without double[]counting, by reference to the extraordinary brutality involved in an offense" or where the "defendant's behavior extended to the extreme reaches of the prohibited behavior." Id. at 75 (citation omitted).

33

Here, the sentencing court could not properly find aggravating factor one simply because "a death resulted from defendant's conduct," id. at 76 (quoting State v. Briggs, 349 N.J. Super. 496, 505 (2002)), but instead was required to determine if defendant's conduct "was 'especially heinous, cruel, [or] depraved'" based on the information in the record, id. at 77 (alteration in original) (quoting N.J.S.A. 2C:44-1(a)(1)). The court, however, did not adequately explain the basis for its application of aggravating factor one. It "neither discussed in detail the circumstances of the offense nor identified the facts in the record — distinct from the facts necessary to prove the elements of [murder] — that supported its finding." Ibid. We are therefore constrained to vacate defendant's sentences and remand for resentencing. The court shall determine "if there is credible evidence in the record to support" its finding of aggravating factor one and "provide a detailed explanation of its findings with respect to this and any other factor applied." Id. at 78.

We do not find merit in defendant's contention the court erred by relying on his prior offense history as a basis for finding aggravating factors three and nine. Defendant contends the court also erred in weighing those factors because it failed to consider the lack of severity of his previous offenses.

The law is well-settled that a court may properly consider defendant's prior history of criminality to support findings of aggravating factors three, six and nine. State v. Dalziel, 182 N.J. 494, 502 (2005). The record supports the court's determination because it shows defendant had 1999 convictions for two counts of third-degree burglary, N.J.S.A. 2C:18-2, and one count of third-degree arson, N.J.S.A. 2C:17-1(b)(2), under two indictments. He was sentenced to serve a jail term as a condition of probation. In 2001, the Family Court entered a domestic violence temporary restraining order against him that was subsequently withdrawn. In 2002, 2005, 2008, and 2009, he was found guilty of offenses in municipal court. In 2010, he was found guilty in municipal court of abuse, abandonment, or cruelty of children, N.J.S.A. 9:6-1. In 2010, he was found guilty in municipal court of three separate offenses. In 2012, he was convicted of fourth-degree unlawful possession of a stun gun, N.J.S.A. 2C:39-3(h), and received a probationary sentence. Less than one year later, he committed the murder and other offenses for which the court imposed the sentence under review.

A sentencing court may consider the length of a defendant's criminal record, irrespective of whether each offense resulted in a conviction, State v. Tanksley, 245 N.J. Super. 390, 397 (App. Div. 1991), and may consider convictions for relatively minor

offenses. <u>State v. T.C.</u>, 347 N.J. Super. 219, 244 (App. Div. 2003). Defendant's record demonstrates a lengthy and consistent history of violating the law and provided sufficient credible evidence supporting the court's finding of aggravating factors three, six and nine. <u>See</u> <u>State v. O'Donnell</u>, 117 N.J. 210, 216 (1989) ("[A]n appellate court should not second-guess a trial court's finding of sufficient facts to support an aggravating or mitigating factor if that finding is supported by substantial evidence in the record."). We further discern no basis to "second-guess" the court's weighing any of those aggravating factors. <u>See</u> <u>Cassady</u>, 198 N.J. at 180-81.

Defendant's remaining arguments are without merit sufficient to warrant discussion in a written opinion. <u>R.</u> 2:11-3(e)(2).

Defendant's convictions are affirmed. We vacate defendant's sentence and remand for further proceedings in accordance with this opinion. We do not retain jurisdiction.

I hereby certify that the foregoing
is a true copy of the original on
file in my office.

CLERK OF THE APPELLATE DIVISION

A-0818-15T4